# ELGIN NATIONAL WATCH COMPANY *v.* ILLINOIS WATCH CASE COMPANY.

APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE SEVENTH CIRCUIT.

No. 121. Argued December 5, 1900. — Decided January 7, 1901.

The term trade mark means a distinctive mark of authenticity, through which the products of particular manufacturers or the vendible commodities of particular merchants may be distinguished from those of others.

As its office is to point out distinctively the origin or ownership of the ar-

ticles to which it is affixed, no sign or form of words can be appropriated as a valid trade mark, which from the fact conveyed by its primary meaning, others may employ with equal truth, and with equal right, for the same purpose.

Words which are merely descriptive of the place where an article is manufactured cannot be monopolized as a trade mark, and this is true of the word " Elgin " as in controversy in this case.

Where such a word has acquired a secondary signification in connection with its use, protection from imposition and fraud will be afforded by the courts, while at the same time it may not be susceptible of registration as a trade mark under the act of Congress of March 3, 1881.

The parties to this suit being all citizens of the same State and the word in controversy being a geographical name, which could not be properly registered as a valid trade mark under the statute, the Circuit Court had no jurisdiction.

In view of this conclusion and of the fact that the constitutionality of the act of Congress was not passed on by the court below, that subject is not considered.

THIS was a bill filed in the Circuit Court of the United States for the Northern District of Illinois by the Elgin National Watch Company, a corporation organized under the laws of the State of Illinois, having its principal place of business at Elgin and its office in Chicago, in that State, against the Illinois Watch Case Company, also a corporation of Illinois, with its principal place of business at Elgin, and certain other defendants, citizens of Illinois.

The bill alleged :

".That prior to the 11th day of April, A. D. 1868, your orator was engaged in the business of manufacturing watches at Elgin, Illinois, which was then a small town containing no other manufactory of watches or watch cases ; that your orator had built up at said town a very large business in the manufacture of watches and watch movements, and that said watches and watch movements, so made by your orator, had become known all over the world, and had been largely sold and used not only in this but in foreign countries.

"　.　.　.　That at and before said 11th day of April, A. D. 1868, your orator had adopted the word ' Elgin ' as a trade mark for its said watches and watch movements ; that said trade mark was marked upon the watches and watch movements

made by your orator, both upon those which entered into commerce in this country and those which were exported to and sold in foreign countries; that your orator's watches became known all over the world as Elgin watches, and their origin and source, as a product of your orator's manufacture, were distinguished from those of all other watches manufactured in any part of the world by said distinguishing word or trade mark, 'Elgin'; that from said 11th day of April, A. D. 1868, to the present time, your orator, both in the goods manufactured and sold by it in this country and those exported by it to and sold in foreign countries, has continued to use said trade mark upon its watches and watch movements, and is still using it, and that said trade mark has always served and still serves to distinguish your orator's product from that of all other manufacturers.

" . . . That at the time of its adoption of said trade mark no other person, firm or corporation engaged in the manufacture or sale of watches was using the word 'Elgin' as a trade mark or as a designation to designate its goods from those of other manufacturers, and that your orator had the legal right to appropriate and use the said word as its lawful trade mark for its watches and watch movements.

" . . . That the watches and watch movements made by your orator have achieved a very great reputation throughout the world, and that such reputation is of great commercial value to your orator in its business aforesaid."

It was further averred "that on the 19th day of July, A. D. 1892, under the act of Congress relating to the registration of trade marks, your orator caused said trade mark to be duly registered in the Patent Office of the United States according to law, as by the certificate of said registration, or a copy thereof, duly certified by the Commissioner of Patents, here in court to be produced, will more fully and at large appear."

The bill charged that defendants had infringed the rights of complainant by engraving or otherwise affixing the word "Elgin" to the watch cases made and sold by them; that such watch cases were adapted to receiving watch movements

of different construction from those made by complainant; that inferior watch movements were liable to be and often were encased in them, and that when so encased the entire watch, including both movement and case, appeared upon the market with the word "Elgin" upon it, thereby leading the public to believe that the watch as an entirety was made by complainant, and enabling parties wrongfully using complainant's trade mark to profit by the great reputation of complainant, to palm off other and inferior goods as goods made by complainant, to injure the reputation of complainant as a watchmaker, and to deprive it of a portion of the business and patronage which it would otherwise receive from the public, to the irreparable damage of complainant.

The prayer was for damages and for an injunction to restrain defendants "from directly or indirectly making or selling any watch case or watch cases marked with your orator's said trade mark, and from using your orator's said trade mark in any way upon watches or watch cases or in the defendants' printed advertisements, circulars, labels, or the boxes or packages in which their said watch cases are put or exposed for sale."

A demurrer having been overruled, defendants answered denying the legality of the registration of the alleged trade mark, and any attempt on their part to deceive the public or the doing of anything they did not have the legal right to do; and asserting that they had never manufactured or offered for sale watches or watch movements; that they manufactured at Elgin watch cases only; that complainant had never manufactured or sold watch cases with the word "Elgin" on them; that the business of the two companies was separate and distinct, and that whenever the defendant company had used the word "Elgin" it had usually, if not invariably, been done in connection with some other word, as "Elgin Giant," or "Elgin Commander," or "Elgin Tiger," or some other word in combination with the word "Elgin"; that defendant company had never used the word "Elgin" alone, or separately, as registered by complainant, upon goods exported to foreign nations or used in foreign commerce, but only in domestic commerce, and to inform the public of the place where watch cases of the defendant com-

pany were manufactured; that such watches were sold upon a guarantee running for a number of years, so that it was necessary to indicate the name of the location where defendant company was carrying on its business, that purchasers might be able to find the company in case it became necessary to call upon it to make good its guarantees; " and that, owing to the distinct lines of business in which the complainant and the defendant company are engaged, no misunderstanding or confusion has arisen or can arise, as these defendants are informed and believe."

It was further alleged "that the word 'Elgin,' being a geographical name or word indicating the name of a prominent manufacturing city in which any manufacturer of watches, watch movements or watch cases is at liberty to locate and carry on his business, is not appropriable by any single manufacturing person, firm or corporation, but is open as of common right to the use of any person, firm or corporation carrying on business at the city of Elgin."

Replication was filed, proofs taken, and a hearing had. By leave of court complainant amended its bill, alleging that the watch cases so manufactured and marked by defendants in violation of complainant's rights were intended by defendants to be sold in foreign countries, and were in fact exported to and sold in foreign countries.

The Circuit Court decreed that the use of the word "Elgin," whether alone or in connection with other words, was a violation and infringement of complainant's exclusive rights in the premises, and that an injunction issue restraining the use of the word alone or in connection with other words or devices, upon watches, or watch cases, or packages containing watches or watch cases, going into commerce with foreign nations or with the Indian tribes, in such a way as to be liable to cause purchasers or others to mistake said watches or the watch movements encased in said watch cases for watches or watch movements manufactured by complainant. 89 Fed. Rep. 487. The case having been carried to the Court of Appeals, that court reversed the decree of the Circuit Court, and remanded the cause with instructions to dismiss the bill. 94 Fed. Rep. 667.

*Mr. Lysander Hill* for appellants. *Mr. George S. Prindle* was on his brief.

*Mr. Thomas A. Banning* for appellees. *Mr. Ephraim Banning* was on his brief.

MR. CHIEF JUSTICE FULLER, after stating the case, delivered the opinion of the court.

The Circuit Court of Appeals held that the bill must be dismissed for want of jurisdiction. The parties to the suit were all citizens of Illinois, and the court was of opinion that it could not be maintained under the act of March 3, 1881, c. 138, 21 Stat. 502.

In the *Trade Mark Cases*, 100 U. S. 82, this court held that the act of July 8, 1870, carried forward into sections 4937 to 4947 of the Revised Statutes, was void for want of constitutional authority, inasmuch as it was so framed that its provisions were applicable to all commerce, and could not be confined to that which was subject to the control of Congress. The cases involved certain indictments under the act of August 14, 1876, " to punish the counterfeiting of trade mark goods and the sale or dealing in of counterfeit trade mark goods; " and the opinion treated chiefly of the act of 1870 and the civil remedy which that act provided, because, as Mr. Justice Miller observed, " the criminal offences described in the act of 1876 are, by their express terms, solely referable to frauds, counterfeits, and unlawful use of trade marks which were registered under the provisions of the former act. If that act is unconstitutional, so that the registration under it confers no lawful right, then the criminal enactment intended to protect that right falls with it."

In its opinion the court, adhering to the settled rule to decide no more than is necessary to the case in hand, was careful to say that the question " whether the trade mark bears such a relation to commerce in general terms as to bring it within congressional control, when used or applied to the classes of commerce which fall within that control, is one which, in the

present case, we propose to leave undecided." And further: " In what we have here said we wish to be understood as leaving untouched the whole question of the treaty-making power over trade marks and of the duty of Congress to pass any laws necessary to carry treaties into effect."

The act of March 3, 1881, followed. By its first section it was provided that " owners of trade marks used in commerce with foreign nations, or with the Indian tribes, provided such owners shall be domiciled in the United States, or located in any foreign country or tribe, which by treaty, convention or law, affords similar privileges to citizens of the United States, may obtain registration of such trade marks by complying with " certain specified requirements.

By the second section, the application prescribed by the first " must, in order to create any right whatever in favor of the party filing it, be accompanied by a written declaration," " that such party has at the time a right to the use of the trade mark sought to be registered, and that no other person, firm or corporation has the right to such use, either in the identical form or in any such near resemblance thereto as might be calculated to deceive; that such trade mark is used in commerce with foreign nations or Indian tribes, as above indicated; . . . "

The third section provided that " no alleged trade mark shall be registered unless the same appear to be lawfully used as such by the applicant in foreign commerce or commerce with Indian tribes as above mentioned or is within the provision of a treaty, convention, or declaration with a foreign power; nor which is merely the name of the applicant; nor which is identical with a registered or known trade mark owned by another and appropriate to the same class of merchandise, or which so nearly resembles some other person's lawful trade mark as to be likely to cause confusion or mistake in the mind of the public, or to deceive purchasers."

By the fourth section certificates of registration of trade marks were to be issued, copies of which, and of trade marks and declarations filed therewith, should be evidence " in any suit in which such trade marks shall be brought in controversy; " and by section five it was provided that the certificate of registry

should remain in force for thirty years from its date, and might be renewed for a like period. By the eleventh section nothing in the act was to be construed " to give cognizance to any court of the United States in an action or suit between citizens of the same State, unless the trade mark in controversy is used on goods intended to be transported to a foreign country or in lawful commercial intercourse with an Indian tribe." The seventh section was as follows: .

" That registration of a trade mark shall be *prima facie* evidence of ownership. Any person who shall reproduce, counterfeit, copy or colorably imitate any trade mark registered under this act and affix the same to merchandise of substantially the same descriptive properties as those described in the registration, shall be liable to an action on the case for damages, for the wrongful use of said trade mark, at the suit of the owner thereof; and the party aggrieved shall also have his remedy according to the course of equity to enjoin the wrongful use of such trade mark used in foreign commerce or commerce with Indian tribes, as aforesaid, and to recover compensation therefor in any court having jurisdiction over the person guilty of such wrongful act; and courts of the United States shall have original and appellate jurisdiction in such cases without regard to the amount in controversy."

Thus it is seen that under the act registration is *prima facie* evidence of ownership; that the certificate is evidence in any suit or action in which the registered trade mark is brought in controversy; that the act practically enables treaty stipulations to be carried out, and affords the basis for judicial redress for infringement in foreign countries, where such redress cannot ordinarily be had without registration, as well as in the courts of the United States, when jurisdiction would not otherwise exist. For it is the assertion of rights derived under the act which gives cognizance to courts of the United States when the controversy is between citizens of the same State, though the benefits of the act cannot be availed of if the alleged trade mark is not susceptible of exclusive ownership as such, and not, therefore, of registration.

Trade marks are not defined by the act, which assumes their

existence and ownership, and provides for a verified declaration by applicants for registration that they have the exclusive right to the particular trade mark sought to be registered.

The term has been in use from a very early date, and, generally speaking, means a distinctive mark of authenticity, through which the products of particular manufacturers or the vendible commodities of particular merchants may be distinguished from those of others. It may consist in any symbol or in any form of words, but as its office is to point out distinctively the origin or ownership of the articles to which it is affixed, it follows that no sign or form of words can be appropriated as a valid trade mark, which from the nature of the fact conveyed by its primary meaning, others may employ with equal truth, and with equal right, for the same purpose.

And the general rule is thoroughly established that words that do not in and of themselves indicate anything in the nature of origin, manufacture or ownership, but are merely descriptive of the place where an article is manufactured or produced, cannot be monopolized as a trade mark. *Canal Company* v. *Clark,* 13 Wall. 311; *Brown Chemical Company* v. *Meyer,* 139 U. S. 540; *Columbia Mill Company* v. *Alcorn,* 150 U. S. 460, and cases cited.

The word "Elgin" is and has been for very many years the name of a well known manufacturing city in Illinois. The factory and business of appellees were located at Elgin, and in describing their watch cases, as made there, it is not denied that they told the literal truth so far as that fact was concerned, and this they were entitled to do according to the general rule. Obviously to hold that appellant had obtained the exclusive right to use the name "Elgin" would be to disregard the doctrine characterized by Mr. Justice Strong, in *Canal Company* v. *Clark,* as sound doctrine, "that no one can apply the name of a district of country to a well known article of commerce, and obtain thereby such an exclusive right to the application as to prevent others inhabiting the district or dealing in similar articles coming from the district, from truthfully using the same designation."

But it is contended that the name "Elgin" had acquired a

secondary signification in connection with its use by appellant, and should not, for that reason, be considered or treated as merely a geographical name. It is undoubtedly true that where such a secondary signification has been acquired, its use in that sense will be protected by restraining the use of the word by others in such a way as to amount to a fraud on the public, and on those to whose employment of it the special meaning has become attached.

In other words, the manufacturer of particular goods is entitled to the reputation they have acquired, and the public is entitled to the means of distinguishing between those, and other, goods; and protection is accorded against unfair dealing, whether there be a technical trade mark or not. The essence of the wrong consists in the sale of the goods of one manufacturer or vendor for those of another.

If a plaintiff has the absolute right to the use of a particular word or words as a trade mark, then if an infringement is shown, the wrongful or fraudulent intent is presumed, and although allowed to be rebutted in exemption of damages, the further violation of the right of property will nevertheless be restrained. But where an alleged trade mark is not in itself a good trade mark, yet the use of the word has come to denote the particular manufacturer or vendor, relief against unfair competition or perfidious dealing will be awarded by requiring the use of the word by another to be confined to its primary sense by such limitations as will prevent misapprehension on the question of origin. In the latter class of cases such circumstances must be made out as will show wrongful intent in fact, or justify that inference from the inevitable consequences of the act complained of. *Lawrence Manufacturing Co.* v. *Tennessee Manufacturing Co.*, 138 U. S. 537, 549; *Coats* v. *Merrick Thread Co.*, 149 U. S. 562; *Singer Man. Co.* v. *June Man. Co.*, 163 U. S. 169.

In *Singer Man. Company* v. *June Man. Company*, the Singer machines were covered by patents, whereby there was given to them a distinctive character and form, which caused them to be known as the Singer machines, as differing from the form and character of machines made by others. The word "Singer" was adopted by the Singer Company as designative of their

distincti *v*e style of machines rather than as solely indicative of the origin of manufacture. That word constituted the generic description of the type and class of machines made by that company, and, on the expiration of the patent, the right to make the patented article and to use the generic name necessarily passed to the public. But nevertheless this court held that those who availed themselves of this public dedication to make the machines and use the generic designation did so on condition that the name should be so used as not to deprive others of their rights or to deceive the public. Mr. Justice White, delivering the opinion, said :

"It is obvious that if the name dedicated to the public, either as a consequence of the monopoly or by the voluntary act of the party, has a twofold significance, one generic and the other pointing to the origin of manufacture, and the name is availed of by another without clearly indicating that the machine, upon which the name is marked, is made by him, then the right to use the name because of its generic signification would imply a power to destroy any good will which belonged to the original maker. It would import, not only this; but also the unrestrained right to deceive and defraud the public by so using the name as to delude them into believing that the machine made by one person was made by another."

In *Reddaway* v. *Banham*, App. Cas. 1896, p. 199, much relied on by appellant's counsel, Reddaway was a manufacturer of belting from camel hair, which belting he had called "camel hair belting" for many years, so that it had become known in the trade as belting of his manufacture. Banham, long after, made belting from the same material, which he sold and advertised as Arabian belting, but subsequently he, or a company he had formed, began to call it "camel hair belting." Reddaway and Reddaway's company brought an action for injunction, which was tried before Collins, J., (now Lord Justice Collins), and a special jury. The jury answered certain questions to the effect that "camel hair belting" meant belting made by plaintiffs as distinguished from belting made by other manufacturers; that the words did not mean belting of a particular kind without reference to any particular maker; that the defendants so

described their belting as to be likely to mislead purchasers and to lead them to buy defendants' belting as and for plaintiffs' belting ; and that defendants endeavored to pass off their goods as and for plaintiffs' goods, so as to be likely to deceive purchasers.   On the findings of the jury, Collins, J., entered a decree for plaintiffs, and granted an injunction restraining defendants " from continuing to use the words ' camel hair ' in such a manner as to deceive purchasers into the belief that they are purchasing belting of the plaintiffs' manufacture, and from thereby passing off their belting as and for the belting of the plaintiffs' manufacture."   The case having gone to the Court of Appeals, the decree was reversed, and judgment entered for defendants, (Q. B. Div. 1895, p. 286,) and plaintiffs thereupon prosecuted an appeal to the House of Lords, which reversed the Court of Appeals, and reinstated the decision of Collins, J., with a slight modification.   The case was held to fall within the principle, as put by the Lord Chancellor, " that nobody has any right to represent his goods as the goods of somebody else."

Lord Herschel, referring to *Wotherspoon* v. *Currie*, L. R. 5 H. L. 508, said :

" The name ' Glenfield ' had become associated with the starch manufactured by the plaintiff, and the defendant, although he established his manufactory at Glenfield, was restrained from using that word in connection with his goods in such a way as to deceive.   Where the name of a place precedes the name of an article sold, it *prima facie* means that this is its place of production or manufacture.   It is descriptive, as it strikes me, in just the same sense as ' camel hair ' is descriptive of the material of which the plaintiff's belting is made.   Lord Westbury pointed out that the term ' Glenfield ' had acquired in the trade a secondary signification different from its primary one, that in connection with the word starch it had come to mean starch which was the manufacture of the plaintiff."

And Lord Herschel further said that he demurred to the view —

" That the defendants in this case were telling the simple truth when they sold their belting as camel hair belting.   I think the fallacy lies in overlooking the fact that a word may

acquire in a trade a secondary signification differing from its primary one, and that if it is used to persons in the trade who will understand it, and be known and intended to understand it in its secondary sense, it will none the less be a falsehood that in its primary sense it may be true."

These and like cases do not sustain the proposition that words which in their primary signification give notice of a general fact, and may be used for that purpose by every one, can lawfully be withdrawn from common use in that sense; but they illustrate the adequacy of the protection from imposition and fraud in respect of a secondary signification afforded by the courts.

In the instance of a lawfully registered trade mark, the fact of its use by another creates a cause of action. In the instance of the use in bad faith of a sign not in itself susceptible of being a valid trade mark but so employed as to have acquired a secondary meaning, the whole matter lies *in pais.*

It is to be observed, however, that the question we are considering is not whether this record makes out a case of false representation, or perfidious dealing, or unfair competition, but whether appellant had the exclusive right to use the word " Elgin " as against all the world. Was it a lawfully registered trade mark? If the absolute right to the word as a trade mark belonged to appellant, then the Circuit Court had jurisdiction under the statute to award relief for infringement; but if it were not a lawfully registered trade mark, then the Circuit Court of Appeals correctly held that jurisdiction could not be maintained.

And since while the secondary signification attributed to its use of the word might entitle appellant to relief, the fact that primarily it simply described the place of manufacture, and that appellees had the right to use it in that sense, though not the right to use it, without explanation or qualification, if such use would be an instrument of fraud, we are of opinion that the general rule applied, and that this geographical name could not be employed as a trade mark and its exclusive use vested in appellant, and that it was not properly entitled to be registered as such.

In view of this conclusion, and of the fact that the question

of the constitutionality of the act of Congress was not passed on by the court below, we have refrained from any discussion of that subject.

The Circuit Court of Appeals was right, and its decree is

*Affirmed.*