## TILLMAN & BENDEL, Inc., v. CALIFORNIA PACKING CORPORATION.*

No. 6676.

Circuit Court of Appeals, Ninth Circuit.

Feb. 6, 1933.

Supplemental Opinion March 7, 1933.

Herman Phleger, Maurice E. Harrison, and William S. Graham, all of San Francisco, Cal., for appellant.

*Rehearing denied May 3, 1933.

Pillsbury, Madison & Sutro, F. D. Madison, Marshall P. Madison, and L. B. Groezinger, all of San Francisco, Cal., for appellee.

Before WILBUR and SAWTELLE, Circuit Judges, and NORCROSS, District Judge.

SAWTELLE, Circuit Judge.

The appellant brought this suit to enjoin the appellee's use of the trade-mark "Del Monte" on coffee, and for an accounting and general relief. The defendant-appellee, by answer and cross-claim, denied the plaintiff-appellant's right to the trade-mark, alleged that its trade-mark rights had been infringed, and asked for an injunction perpetually restraining the appellant from using the trade-mark "Del Monte" on coffee. In a supplement to its answer and cross-complaint, the appellee asked for damages, which it asserted to be $1,000,000. Additional pleadings were filed by both parties, and a lengthy trial was had.

The lower court entered a decree enjoining the appellant, perpetually, from using the name "Del Monte" on coffee "not by or for the defendant [appellee] made." In an amended decree, the court below awarded costs, amounting to $533.03, in favor of the appellee and against the appellant. In a memorandum opinion[1] the District Court declared that because of the appellant's good faith and because of the fact that the appellee had not proved actual damage, there would be no award of damages in favor of the appellee.

Tillman & Bendel, Inc., the appellant herein, was established in 1857 under the name of F. Tillman & Co., a partnership, by F. Tillman, father of Frederick Tillman, a witness in this case, and grandfather of F. A. Tillman, president of the appellant and its predecessor company since 1915. The concern was incorporated on December 31, 1891, and was re-incorporated, under the style of Tillman & Bendel, Inc., in 1920. Under an agreement dated April 1, 1920, Tillman & Bendel transferred to Tillman & Bendel, Inc., all of the old corporation's "trade-marks, trade names, patents, and inventions."

Up to 1924 the appellant and its predecessors had been engaged in the "diversified wholesale grocery business." In 1924 the corporation, under the direction of F. A. Tillman, the grandson, liquidated the different departments of its business, except the manufacturing department, "which was always

[1] Not for publication.

the profitable end of the business." The company thereafter manufactured tea, coffee, spices, and extracts, until about 1926, when it "decided to eliminate the manufacture of spices and extracts and give up teas, and concentrate all [its] efforts on coffee."

In the late eighties, Tillman & Bendel began selling coffee under the name "Del Monte." The testimony varies as to the precise year, but it was probably some time between 1886 and 1888. The court found the year to be 1887, or prior thereto.

The origin of the name is relied upon by the court below and by the appellee as indicating that, as used by the appellant, "Del Monte" was a grade mark and not a trade-mark. For that reason a brief history of such origin will be helpful.

In about the year 1886, George Schonewald, buyer for Hotel Del Monte, near Monterey, Cal., and later buyer for Castle Crag, purchased a blend of coffee from Tillman & Bendel which pleased him so much that he insisted it be stenciled "Del Monte." According to one of the appellant's witnesses, the quality of the merchandise likewise so pleased Mr. Schonewald "that he told his patrons, his friends, and little by little a demand manifested itself for Del Monte goods, * * * and [the appellant] commenced to list Del Monte commodities under the Del Monte brand * * * and many people, private individuals, friends of ours, heard about it, and used to prevail upon us to sell them the Del Monte blend." The court found substantially in accordance with this testimony, but also found that the appellant used the name merely as a grade mark and not a trade-mark, until 1925, when the appellant attempted a trade-mark use.

The court below also found that "prior to the year 1927, plaintiff [appellant] did sell coffee under the name Del Monte in the states of California, Nevada, Oregon, Washington, Montana, and Arizona, but not elsewhere." The appellant, indeed, concedes that "during the succeeding years and until 1926, the Del Monte *coffee* business of Tillman & Bendel continued to be very largely a western business." The appellant also concedes that "meanwhile, between 1904 and 1918, the defendant [appellee] and its predecessor company were establishing markets in all parts of the country for their Del Monte *fruits and vegetables*."

In 1926, following the liquidation of all of the appellant's business save the manufacturing, as set forth above, the appellant "made plans for an extension" of its coffee

business. In furtherance of these plans, its president, F. A. Tillman, made several trips east, during which he came into contact with brokers and called on a great many large accounts throughout the United States. Other representatives of the appellant made similar trips. These trips covered a period extending from June, 1927, to December, 1929. Other promotional work was undertaken.

As a result of this sales campaign, the appellant established an extensive market for its Del Monte coffee in the middle west and in the east. One of the appellant's exhibits in the court below is a comparative table of sales of Tillman & Bendel's Del Monte coffee, as follows: 1925, 9,302 pounds; 1926, 8,329 pounds; 1927, 301,196 pounds; 1928, 227,506 pounds. The present suit was filed on January 14, 1929. Another exhibit, showing the sales of the appellant's Del Monte coffee by localities, discloses considerable distribution in sections east of the Mississippi river.

But there is no affirmative evidence that any confusion disadvantageous to the appellant has resulted from the sale of the two Del Monte brands, either in the east or the west, and the lower court so found. Five pieces of testimony do, indeed, indicate that there might have been confusion in favor of the appellee and disadvantageous to the appellant, but speculation and inference cannot take the place of affirmative proof.

We refer to the testimony of T. S. Spaulding, a grocer of Woodland, Yolo county, Cal., who stated that "in the early days," in the year 1888, the appellant's coffee bearing the Del Monte brand was better known than the appellee's Del Monte fruits and vegetables; the testimony of L. B. Taft, a grocery broker of Salt Lake City, to the effect that in 1929 and the early part of 1930, the "California Packing Corporation, covering practically the same territory as we did, had stepped in [with its Del Monte coffee] with a considerably larger sales organization than we have, and had gathered in the business that we had established on our Del Monte coffee [of the appellant]"; the testimony of Frank H. Cooney, merchandise broker of Butte, Mont., who said that "the effect of this [Del Monte] advertising of the California Packing Corporation upon our sales of Del Monte coffee of Tillman & Bendel has been that it has almost ruined it"; the statement of F. A. Tillman as to the "disastrous" effect of the appellee's Del Monte coffee advertising upon the Tillman Del Monte coffee business; and the assertion of Kenneth G. Blodgett, a Boston merchandise broker, that an impression given by a representative of the appellee to the effect that Tillman & Bendel had "sold out" to the appellee, had lost Mr. Blodgett a customer for the appellant's Del Monte coffee.

It will be noted that nowhere in the foregoing testimony is there a statement that a single can of the appellee's coffee was sold to a customer who believed that he was buying the appellant's product. Furthermore, all the evidence as to confusion whereby the appellant *might* have been damaged was in the form of testimony given in open court, and the District Judge was better qualified to pass upon the weight to be given to it—especially when several of the appellant's own witnesses testified that there was no confusion, one way or the other, in the minds of retailers or their employees, or in the minds of the general public.

There is, on the other hand, considerable evidence of confusion between the appellant's and the appellee's Del Monte coffees disadvantageous to the appellee; that is to say, confusion whereby purchasers of the appellant's Del Monte coffee believed they were buying Del Monte coffee put out by the appellee, as a result of which confusion it is safe to assume that the appellee lost numerous sales of its own coffee. We will take up the evidence of this confusion in its proper place, as part of the discussion of the appellee's history, to which we now turn our attention.

The appellee's first predecessor, the Oakland Preserving Company, was incorporated on April 14, 1891. Frederick Tillman, the father of F. A. Tillman, the president of the appellant since 1915, was the incorporator and the president of the Oakland Company. In 1899 that company combined with certain other corporations to form the California Fruit Canners' Association. In 1916 the California Packing Corporation, the appellee herein, took over the business of the California Fruit Canners' Association, including the latter's brands, good will, and trademarks.

The Oakland Preserving Company began using the name Del Monte on its canned fruits and vegetables some time prior to June, 1891.

Frederick Tillman, who at that time owned the controlling interest in the Oakland Company and also was a partner in the firm of Tillman & Bendel, suggested that the Oakland Company use the name Del Monte on its products. The story of the origin of the

name, so far as the appellee's predecessor is concerned, is told by Charles William Pike of San Francisco, who built the Oakland plant for Mr. Tillman: "Before we started operating [in June, 1891] Frederick Tillman and I decided to select the brands to be used, and at that time there were three pound extras of the higher grade and two and one-half pound extra standard, standard and second. I suggested at that period that we use the Oakland name for extras, that we should have two brands, and Fred Tillman suggested the word 'Del Monte' and I, happily, approved of it, and that was the birth of the Del Monte brand."

█ In its answer to the appellee's cross-complaint, the appellant admits: "That shortly after the creation and organization of Oakland Preserving Company the said Frederick Tillman personally suggested and caused the said Oakland Preserving Company, of which he was president, to adopt the name Del Monte as its trade mark for canned fruits and canned vegetables; but plaintiff is without knowledge as to whether large or any quantities of the goods, canned fruits and canned vegetables, of said company, bearing the trade mark Del Monte, were sold, and/or distributed throughout the United States." The lower court found that the appellee's averments as to the suggestion of the name by Tillman were true, but also found, "as a matter of law, that the facts set forth in said averments are not sufficient to estop the plaintiff from asserting its claim as set forth in its bill of complaint herein or otherwise." Since the appellee has filed no cross-appeal, and since no plain error of law is involved in the court's finding, it will not be disturbed.

The Oakland Preserving Company executed a bill of sale transferring all its business and good will and trade-marks to the California Fruit Canners' Association, and the latter company, as we have seen, did likewise in favor of the appellee.

The development of the appellee's business; the magnitude of its publicity campaign, whereby the name "Del Monte" has literally become a household word, as being the brand of goods produced by the appellee; the "high reputation established by the appellee"; "its high standard of quality"; its "care in the preparation of its products" — all these and kindred matters have already been settled by this court, in the case of Del Monte Special Food Company v. California Packing Corporation, 34 F.(2d) 774, 775. Those facts need not be rehearsed here. For the sake of historical completeness, however,

we will quote from that decision an excerpt in which the growth of the appellee is briefly traced:

"Beginning 35 years ago, the appellee and its predecessors have organized and established a vast business in the production and sale of various food products, all labeled 'Del Monte Brand.' The words 'Del Monte' in Old English type conspicuously displayed upon a shield coupled with the word 'Brand' constitute the most prominent characteristic of the goods produced by the appellee. The name of appellee is printed upon its labels, but in a type so inconspicuous that it would hardly be noted when the goods were displayed upon the shelves of the grocery store, and might even escape closer inspection. In its advertising matter, as well as in its method of labeling its products, the emphasis is placed entirely upon the 'Del Monte Brand,' and little or no emphasis upon the name of the producer. The business has grown until the annual sales of the appellee aggregate over thirty millions of dollars, and it is estimated that the number of cans and packages labeled 'Del Monte Brand' disposed of in a year exceed 100,000,000. The advertising expenditures of the appellee in making known its Del Monte Brand products has exceeded $2,000,000 in 1927, and the total expenditure for advertising these products has exceeded $11,800,000. The appellee's business has been constantly expanding, not only in volume but in the diversity of products produced and labeled with its brand, until at the present time it markets over 150 food products under the name 'Del Monte Brand,' all being sold in grocery stores. The public has become familiar not only with the label of the appellee but with their course of business by which they have gradually extended their operations to other food products.

"From time to time the appellee has registered the 'Del Monte Brand' with the shield as a trade-mark for use in connection with various food products prepared and marketed by it."

In the instant case the lower court made findings in substantial agreement with most of the statements contained in the foregoing excerpt, and there was ample evidence to sustain such findings. By stipulation it is a settled fact in this case that "by 1918 the California Packing Corporation had established markets for its entire line of Del Monte products throughout the territory of the entire United States."

It was stipulated, however, that "there

was no substantial commercial sale of coffee" by the appellee "prior to 1928."

In view of these facts, it now becomes necessary for us to revert to the question of confusion, already touched upon herein. Did the appellant's entry with its Del Monte coffee into the eastern food market, where, by stipulation, the appellee's Del Monte brand was firmly entrenched, cause confusion in the minds of the buying public? In other words, did an appreciable number of persons buy Tillman & Bendel's Del Monte coffee under the belief that it was in reality a product of the appellee?

The court below found that there had been such confusion, and the record contains abundant evidence sustaining that finding. In one of the appellee's exhibits there is a stipulation that the depositions of a large number of persons may be deemed to have been taken, tending to show confusion in the minds of approximately 150 persons, both housewives and storekeepers, as to whether or not the appellee was manufacturing or producing Tillman & Bendel Del Monte coffee. In this stipulation as to deposition testimony, many of the witnesses named expressed the actual belief that when they purchased Tillman's Del Monte coffee they "thought that it was a product of the same concern that packed Del Monte fruits and Del Monte vegetables." It is true that a number of these persons later, by oral testimony or by deposition, qualified or repudiated their stipulated statements. There still remains, however, a considerable residuum of unassailed stipulated testimony as to this confusion.

There is abundant other evidence, however, as to the widespread mistaken belief that the appellant's coffee was being marketed by the appellee. For example, R. M. Slee, manager of a Piggly Wiggly store in San Francisco, testified: "We were carrying Del Monte brand coffee put up by Tillman & Bendel. I knew it was put up by Tillman & Company, but I had always seen the Del Monte label associated with the California Packing Corporation name, so I just merely assumed that Tillman & Bendel were just associated with the California Packing Corporation."

Similarly, Ray Silver, manager of the MacMarr Stores, Limited, in San Francisco, said that he informed an inquirer that Tillman's Del Monte coffee was "put out by the California Packing Corporation"; and, upon being told that the can bore the name of Tillman & Bendel, he replied that "it was more than likely packed by Tillman & Bendel for the Del Monte people," meaning the appellee.

Again, Harry L. Haines, a witness for the appellant, testified as to the confusion prevailing among many of his customers at first: "I advised people upon many occasions that the Del Monte coffee was not put out by the California Packing Corporation. People were constantly inquiring if it was at the beginning; they seemed very much surprised that there were two companies. Some of the people were under the impression that it was put out by the California Packing Corporation; some of them looked at the can, being of a different color, and so forth, and while the name was the same the label was entirely different. On a number of occasions people were surprised at finding it wasn't packed by the corporation."

Boyd Sturgess, another witness for the appellant, stated that he "believed that there was a good deal of the [appellant's] coffee that was sold that went out with the understanding it was put out by the California Packing Corporation."

Still another of the appellant's witnesses, Earl Simpson, who had been in the grocery business at Salem, Or., for about twenty-three years, expressed what seems to us a practical, common-sense view, which becomes particularly apposite in connection with the appellant's contention that it should not be held responsible for the "carelessness" of purchasers: "It is not usual for customers to look over a can to see who it is manufactured by or to see whether it is some name that they don't know anything about, or to see what the name of the manufacturer is on the can or label."

If, as we believe, it is not usual for customers to scrutinize labels with microscopic care, those who do not do so can scarcely be called "careless."

Another federal court, besides the court below, has already passed upon the issue of confusion, unfavorably to the appellant. We allude to the Court of Customs and Patent Appeals, which, in a suit between the identical parties, found as follows: " * * * We conclude that coffee in one-pound tin cans, sold in grocery stores to the same customers who buy the 150 grocery food products manufactured by appellant [the appellee herein], would * * * lead to confusion and mistake in the purchaser believing that the coffee of appellee [the appellant herein] was the goods of appellant. * * * "

That litigation was entitled California

Packing Corporation v. Tillman & Bendel, Inc. (Cust. & Pat. App.) and is reported in 40 F.(2d) 108, 113. It was an appeal from a decision of the Commissioner of Patents dismissing a notice of opposition filed by the California Packing Corporation to the registration by Tillman & Bendel, Inc., of "Del Monte" as a trade-mark for coffee. Tillman & Bendel's application was filed February 21, 1925.

It is true that in the registration case the court carefully limited the scope of its decision: "We are only concerned in this action with appellee's right of *registration* of the trade-mark and not with its *use* of the same. As to whether appellee, in law, has the right to use the trade-mark 'Del Monte' on coffee in containers of any description, or whether it has the right to use it in markets confined to the West coast or throughout the world, are questions not before us and are not decided. We do decide that such a statement of facts is not shown here as would warrant this court in saying that appellee was entitled to the *exclusive* use of the words on coffee, the right to such exclusive use being implied from the right to registration." Page 113 of 40 F.(2d).

■ We are quite aware that, as the appellant so earnestly argues, a decision of the Court of Customs and Patent Appeals is not res adjudicata. Dwight & Lloyd Sintering Co., Inc., v. Greenawalt, etc. (C. C. A. 2) 27 F.(2d) 823, 827. Nevertheless, a well-considered opinion by that federal tribunal, upon an issue so peculiarly within its province, is entitled to persuasive effect upon this court.

As to the question of confusion, the Court of Customs and Patent Appeals, in the registration suit between the two litigants herein, further said, at page 114 of 40 F.(2d): "In the case at bar confusion is proved, but aside from the proved confusion, it is obvious to us that confusion would result. In Nestle & Anglo-Swiss Condensed Milk Co. v. Walter Baker & Co., Ltd., 37 App. D. C. 148, the court said: 'In a trade-mark case involving the question whether there is such a similarity between two marks as will cause confusion in trade, an ocular inspection of the marks constitutes the most satisfactory evidence.'"

In addition to all the foregoing elements connected with the issue of confusion, it is to be observed that there is to be found in the record some evidence that the appellant planned "to ride on the band wagon of" the appellee's advertising. While Frederick A.

Tillman denied this, here again we believe that the District Court was in better position than we to weigh oral evidence.

To summarize, we are satisfied that the lower court did not err in its finding that there was confusion in the minds of the public and the trade as to the trade-mark "Del Monte," and that the appellant, entering the eastern field in 1927, did profit, whether intentionally or unintentionally, by the publicity that the appellee theretofore had given and thereafter gave to the trade-mark "Del Monte."

We now advance to the heart of the present controversy, namely, whether prior to 1925 the appellant used the name "Del Monte" as a trade-mark or as a grade mark. As we have seen, the lower court found that the appellant's use of the name was merely as a "grade-mark" and, in its opinion, it indicated that, had it found that the appellant's use was that of a trade-mark it would have found that the appellant's adoption of the trade-name "Del Monte" was prior to its use by the appellee, and that the appellant would have been entitled to the exclusive use of the name upon coffee in certain western states.

■ In our inquiry as to whether or not the appellant's use of the name "Del Monte" was that of a trade-mark, we shall be guided by the standard laid down by Mr. Justice Strong in Delaware & H. Canal Company v. Clark, 13 Wall. (80 U. S.) 311, 322, 20 L. Ed. 581: "The office of a trade-mark is to point out distinctively the origin, or ownership of the article to which it is affixed; or, in other words, to give notice who was the producer."

■ At the threshold of our investigation, we are confronted with the loose terminology employed by witnesses both for the appellant and the appellee, in referring to Tillman's "Del Monte" as being or indicating a "grade," a "blend," or a "brand," or as constituting a "trade-mark," a "title," a "label," a "name," or a "trade-name." There are at least twenty-nine references to the name by witnesses, including F. A. Tillman himself, as indicating "high grade" or simply "grade." Most of the witnesses using the term "grade" in connection with Tillman's Del Monte name were called by the appellant itself. On the other hand, there are to be found in the record at least eighty-seven direct or indirect references to Tillman & Bendel's "Del Monte" as being a "brand." The name "Del Monte," as used by Tillman & Bendel, is referred to as a "blend" designation seven times. One

witness referred to the Tillman's "Del Monte" as a "trade-name."

There is similar divergence among the various exhibits, as to the designation given to Tillman & Bendel's mark, "Del Monte." One of the appellant's bulletins, dated November 3, 1921, refers to the Del Monte ensemble as a "Title, Label and Trade-mark." That bulletin alone refutes the appellee's statement, made in its brief, that there was no "evidence of any kind, written or oral, which showed, or tended to show, that the plaintiff or its predecessors had ever referred to the name as being a trade-mark prior to the application mentioned [in 1925]."

In a letter to the appellee, F. A. Tillman, on December 13, 1921, referred to his "Del Monte" as a "label" and a "brand." A poster and a carton put out by the appellant show the word "brand" as being used in connection with "Del Monte." The poster was prepared "long before the institution of this suit," according to F. A. Tillman. Both poster and carton carried the legend, "Tillman & Bendel ['s] since 1887." Another of the appellant's exhibits, however—a counter display card—omits the word "brand."

Despite the various discrepancies in the testimony and variances in the exhibits, we are of the opinion that the course of dealing of the appellant during the past four decades indicates that the "function" of the name "Del Monte" was, partly, at least, to designate "origin" or "ownership." That the name also fulfilled the office of a grade designation did not, as we shall presently see, militate against its trade-mark use.

As we have seen, long before the present litigation or the Patent Office controversy was commenced, the appellant referred to its "Del Monte" as a trade-mark. Furthermore, there is evidence that the buying public so regarded it.

C. H. Greenfield, who handled the appellant's "Del Monte" brand between 1889 and 1892, testified: "We pushed the Del Monte brand of coffee with the customers under that name and naturally they asked for it." (R. 223.)

There is considerable testimony that Del Monte was the appellant's "highest grade" of coffee, for at least a great part of the company's history. For example, W. O. Weissich, a former employee of the appellant, testified that "the brand 'Del Monte' always represented the highest grade of coffee." Similarly, John A. Lombard, another former employee stated that "the highest price brand under which we sold bulk coffee was 'Del Monte.'" There was much additional testimony to the same effect.

But the decisions are clear that this fact alone does not militate against the creation of a trade-mark, as contradistinguished from a grade mark. In Menendez v. Holt, 128 U. S. 514, 520, 521, 9 S. Ct. 143, 144, 32 L. Ed. 526, the court said: "They used the words 'La Favorita' to designate flour selected by them, in the exercise of their best judgment, as equal to a certain standard. The brand did not indicate by whom the flour was manufactured, but it did indicate the origin of its selection and classification. It was equivalent to the signature of Holt & Co. to a certificate that the flour was the genuine article which had been determined by them to possess a certain degree of excellence. It did not, of course, in itself indicate quality, for it was merely a fancy name, and in a foreign language, but it evidenced that the skill, knowledge, and judgment of Holt & Co. had been exercised in ascertaining that the particular flour so marked was possessed of a merit rendered definite by their examination, and of a uniformity rendered certain by their selection. * * * And the fact that flour so marked acquired an extensive sale, because the public had discovered that it might be relied on as of a uniformly meritorious quality, demonstrates that the brand deserves protection, rather than that it should be debarred therefrom, on the ground, as argued, of being indicative of quality only. [Cases cited.]"

See, also, Lawrence Manufacturing Company v. Tennessee Manufacturing Company, 138 U. S. 537, 548, 11 S. Ct. 396, 400, 34 L. Ed. 997.

Interpreting its decision in Menendez v. Holt, supra, the Supreme Court, in the Lawrence Case, supra, observed: "We held in Menendez v. Holt, * * * that the words 'La Favorita' were so used as to indicate the origin of a special selection and classification of certain flour, requiring skill, judgment, and expert knowledge, and which gave value and reputation to the flour. The name was purely arbitrary,—a fancy name, and in a foreign language,—and did not in itself indicate quality. The legality of the trademark as such (and it had been duly registered under the act of congress) was conceded by the answer, though it was contended in the argument that it was not valid, because indicative only of quality; but we were of opinion that the primary object of its adoption was to symbolize the exercise of the judgment, skill, and particular knowledge of

the firm which adopted and used it, and that the phrase covered the wish to buy and the power to sell from that origin."

So, in the instant case, the words "Del Monte," as we have seen from our foregoing analysis of the evidence, had for their primary object "to symbolize the exercise of the judgment, skill and particular knowledge" of the appellant, and for their secondary object that of designating the "highest grade" of coffee that had resulted from such exercise of judgment, skill, and particular knowledge.

██ Having determined that the appellant's use of the phrase Del Monte was that of a trade-mark, we now advance to the geographical question of whether or not the appellant is entitled to be protected in its use of the mark so far as certain western states are concerned.

As we have already seen, the court below, in its opinion, stated that, had it been satisfied that the phrase Del Monte, as used on the appellant's coffee, had been "in fact adopted and used as a *trade-mark*," it would have held that the appellant was entitled to the exclusive use of the name upon coffee in the western territory named by the court, namely, California, Nevada, Oregon, Washington, Montana, and Arizona. We are not relying, however, upon this qualified statement of the court in reaching our conclusion on this phase of the case, but we are depending upon our own independent study of the evidence, and the law applicable thereto.

We have already shown that the appellant entered the western field with the name "Del Monte" on its coffee at least as early as 1887, while the court below found that the earliest use of the name on *any* product of the appellee was in 1891. This state of facts enables the appellant to come within the well-established doctrine of prior appropriation in the law of trade-marks.

The doctrine was thus stated by the Supreme Court in United Drug Company v. Theodore Rectanus Company, 248 U. S. 90, 100, 39 S. Ct. 48, 51, 63 L. Ed. 141: "Undoubtedly, the general rule is that, as between conflicting claimants to the right to use the same mark, priority of appropriation determines the question. See [Delaware & H.] Canal Co. v. Clark, 13 Wall. 311, 323, 20 L. Ed. 581; McLean v. Fleming, 96 U. S. 245, 251, 24 L. Ed. 828; [Amoskeag] Manufacturing Co. v. Trainer, 101 U. S. 51, 53, 25 L. Ed. 993; Columbia Mill Co. v. Alcorn, 150 U. S. 460, 463, 14 S. Ct. 151, 37 L. Ed. 1144."

See, also, Hanover Star Milling Co. v. Metcalf, 240 U. S. 403, 415, 36 S. Ct. 357, 60 L. Ed. 713.

Applying this rule to the case at bar, we find the appellee entering the field with its Del Monte coffee in the latter part of 1928, more than four decades after the appellant had begun marketing its coffee in the west under the same trade-mark. As to the west, the appellant was clearly the prior appropriator.

During at least part of those forty years of the appellant's prior appropriation, the appellee had written notice of the situation. In its brief, the appellee says: "No notice of any such [trade mark] claim or use was had by defendant [appellee] prior to December, 1921, when plaintiff [appellant] wrote to defendant that the former had been selling coffee under the name Del Monte for many years and claimed the right so to do exclusively."

The brief cites the testimony of R. I. Bentley, chairman of the board of the appellee, who stated: "The first I heard about Tillman & Bendel Del Monte coffee, or heard that they made any claim about the trade mark Del Monte as applied to coffee, was several years ago, I think about the time they asked for a registration; I think I heard about it at the time they wrote to C. H. Bentley in 1921. I did not hear they had ever marketed coffee until about 1924, when they indicated to us that they were going to do it, or something of that kind."

The letter referred to in the foregoing testimony was written by F. A. Tillman to Charles Bentley, at that time vice president and general manager of the appellee. The letter, which was dated December 13, 1921, contained the following closing paragraph: "We also understand that you either are now, or are contemplating, offering coffee for sale under the Del Monte label. We beg to advise you that for many years we have sold, and are now selling Del Monte brand coffee, and that your sale of coffee under the Del Monte brand will be in direct conflict with our rights. You are further advised that we sell other grocery products such as extracts, spices, ammonia, and bluing under the Del Monte Brand."

While it is hardly likely that even prior to 1921, no member of the appellee's executive staff had ever heard of the appellant's sale of Del Monte coffee, at all events the appellee did receive, at least during that year, formal and official notice of such sale and of the appellant's claim in connection therewith. It will be seen by reference to the letter,

which is one of the appellant's exhibits, that it was addressed to the California Packing Corporation, "Attention, Mr. Charles Bentley."

Of such continued use by a newcomer in the field, the Supreme Court of the United States, in Menendez v. Holt, supra, has said: "The intentional use of another's trade-mark is a fraud; and when the excuse is that the owner permitted such use, that excuse is disposed of by affirmative action to put a stop to it. Persistence, then, in the use is not innocent, and the wrong is a continuing one, demanding restraint by judicial interposition when properly invoked." Page 523 of 128 U. S., 9 S. Ct. 143, 145.

In its answer, the appellee, on information and belief, alleged that in 1921 the appellant abandoned the manufacture and sale of the latter's Del Monte coffee. In the appellee's brief, it is stated that "it appears that within a few weeks after the letter [of December 13, 1921] was sent, plaintiff gave every indication of quitting the use of the name Del Monte on its coffee." In his opinion, in connection with his discussion as to the alleged grade mark used by the appellant, the District Judge stated that, had a trademark use been found by him, he would have held "that the evidence did not show abandonment by the plaintiff." There is ample evidence to sustain the view expressed by the lower court.

■ Failure to register its trade-mark does not affect the appellant's rights thereunder. As we have seen, the decision of the Court of Customs and Patent Appeals does not constitute the controversy res adjudicata; nor are the appellant's rights measurable solely according to the terms of the Trade Mark Act (15 USCA § 81 et seq.).

In the Trade-Mark Cases, 100 U. S. 82, 92, 25 L. Ed. 550, decided more than half a century ago, the Supreme Court said: "The right to adopt and use a symbol or a device to distinguish the goods or property made or sold by the person whose mark it is, to the exclusion of use by all other persons, has been long recognized by the common law and the chancery courts of England and of this country, and by the statutes of some of the States. It is a property right for the violation of which damages may be recovered in an action at law, and the continued violation of it will be enjoined by a court of equity, with compensation for past infringement. This exclusive right was not created by the act of Congress, and does not now depend upon it for its enforcement. The whole system of

trade-mark property and the civil remedies for its protection existed long anterior to that act, and have remained in full force since its passage."

Again, in Estate of P. D. Beckwith's Estate, Inc., v. Commissioner of Patents, 252 U. S. 538, 546, 40 S. Ct. 414, 417, 64 L. Ed. 705, we find the following language used: "Of course, refusal to register a mark does not prevent a former user from continuing its use; but it deprives him of the benefits of the statute, and this should not be done if it can be avoided by fair, even liberal, construction of the act, designed as it is to promote the domestic and foreign trade of our country."

In Waldes et al. v. International Mfrs. Agency, Inc. (D. C.) 237 F. 502, 506, the court said: "People sometimes talk as though registration put some rigid limitation on user, but I know of none such. Registration confers no right, and limits none; it is a mere procedural advantage, depending upon common-law 'ownership,' which can exist quite as well without it. In a case like this, where the jurisdiction of the court does not depend upon it, it gives scarcely any advantage of any sort, except under section 16. It is not, like the issuance of a patent, the condition and the limitation of the owner's rights."

See, also, Ansehl v. Williams (C. C. A. 8) 267 F. 9, 14, and McIlhenny Co. v. Gaidry (C. C. A. 5) 253 F. 613, 616, 617.

To summarize, we hold that the appellant was the prior appropriator of the trade-mark "Del Monte" in the west; that the appellee had formal, written notice of such appropriation in 1921; that, seven years after such notice had been given to it, the appellee entered the western market with its Del Monte coffee; that the appellant at no time abandoned the trade-mark; that the appellant lost none of its rights to the trade-mark as a result of its failure to register the mark, or as a result of the adverse decision of the Court of Customs and Patent Appeals; and that, therefore, it is entitled to an injunction restraining the appellee from using the words Del Monte in certain western states.

■ In view of the fact, however, that there is no evidence of lost sales due to confusion in the west, we conclude that the appellant is not entitled to an accounting for profits or damages. We do so on the authority of Horlick's Malted Milk Corporation v. Horluck's, Inc., 59 F.(2d) 13, 17, decided by this court on May 23, 1932.

We turn now to the east.

The very decisions that hold the prior appropriator's trade-mark rights to be paramount, as quoted above, contain a limitation that precludes the appellant's assertion of those rights in the east. For example, in the Rectanus Case, supra, we find the qualification thus stated, at page 100 of 248 U. S., 39 S. Ct. 48, 51: "The reason for the rule does not extend to a case where the same trade-mark happens to be employed simultaneously by two manufacturers in different markets separate and remote from each other, so that the mark means one thing in one market, an entirely different thing in another. It would be a perversion of the rule of priority to give it such an application in our broadly extended country that an innocent party who had in good faith employed a trade-mark in one state, and by the use of it had built up a trade there, being the first appropriator in that jurisdiction, might afterwards be prevented from using it, with consequent injury to his trade and good will, at the instance of one who theretofore had employed the same mark but only in other and remote jurisdictions, upon the ground that its first employment happened to antedate that of the first-mentioned trader."

The application of this geographical rule is even more fully expounded in the Hanover Case, supra, at page 415 of 240 U. S., 36 S. Ct. 357, 361: "In the ordinary case of parties competing under the same mark in the same market, it is correct to say that prior appropriation settles the question. But where two parties independently are employing the same mark upon goods of the same class, but in separate markets wholly remote the one from the other, the question of prior appropriation is legally insignificant; unless, at least, it appear that the second adopter has selected the mark with some design inimical to the interests of the first user, such as to take the benefit of the reputation of his goods, to forestall the extension of his trade, or the like."

As we have said, it has been stipulated in this case that "by 1918, the California Packing Corporation had established markets for its entire line of Del Monte products throughout the territory of the entire United States." In addition, the court below found that "by the year 1918, and for many years prior thereto, the defendant and cross-complainant had established a secondary meaning for the name Del Monte as averred in said paragraph VIII of said cross-claim throughout the territory of the entire United States."

Finally, in the Del Monte Special Food Case, supra, at pages 774, 775, of 34 F.(2d), this court held that: "The public has become familiar not only with the [Del Monte] label of the appellee, but with their course of business by which they have gradually extended their operations to other food products."

From the foregoing, it would seem well established that, when the appellant entered the eastern field with its Del Monte coffee in 1927, it found a fertile economic soil for its product—a soil that had for years been carefully tilled by the vast advertising of the appellee. In a word, the appellant found firmly entrenched the secondary meaning of "Del Monte" as being the name of the food products of the appellee. As a result of this established secondary meaning, the appellant, whether intentionally or unintentionally, through the public's confusion made many sales. As we have seen, the evidence to this effect is overwhelmingly beyond cavil.

We find the law applicable to such a state of facts well stated by Mr. Chief Justice Fuller in the leading case of Elgin National Watch Co. v. Illinois Watch-Case Company, 179 U. S. 665, 674, 21 S. Ct. 270, 274, 45 L. Ed. 365:

"It is undoubtedly true that where such a secondary signification has been acquired, its use in that sense will be protected by restraining the use of the word by others in such a way as to amount to a fraud on the public, and on those to whose employment of it the special meaning has become attached.

"In other words, the manufacturer of particular goods is entitled to the reputation they have acquired, and the public is entitled to the means of distinguishing between those and other goods; and protection is accorded against unfair dealing, whether there be a technical trademark or not. The essence of the wrong consists in the sale of the goods of one manufacturer or vendor for those of another.

"If a plaintiff has the absolute right to the use of a particular word or words as a trademark, then, if an infringement is shown, the wrongful or fraudulent intent is presumed, and although allowed to be rebutted in exemption of damages, the further violation of the right of property will nevertheless be restrained."

See, also, as to the dispensation with proof of fraudulent intent "where the proof of infringement is clear," at least so far as allowing injunctive relief is concerned, McLean v. Fleming, 96 U. S. 245, 253, 254, 24 L. Ed. 828, and Lawrence Manufacturing

Company v. Tennessee Manufacturing Company, supra, at page 549 of 138 U. S., 11 S. Ct. 396.

But, argues the appellant: "When the defendant began putting out Del Monte coffee at the end of 1928, the plaintiff, fearing that the presence on the market of defendant's coffee would create confusion, voluntarily added the words 'Tillman & Bendel' on the front of its cans."

The appellant also contends that: "The law is well settled that the owner of a trademark is not accountable for the mistaken belief of a careless or inattentive purchaser."

The answer to all of this is to be found both in the facts of this case and in the decisions of this and other courts. We have already quoted the testimony of the veteran grocer, Simpson, to the effect that, "It is not usual for customers to look over a can to see who[m] it is manufactured by."

Common experience confirms this view. Even an ordinarily careful and prudent housewife is not in the habit of subjecting every can of goods that she buys to meticulous scrutiny.

Nor does the law impose any such obligation upon her. In the Horlick Case, supra, this court said, at page 16 of 59 F.(2d):

"The lower court found as a fact that 'the public fails to distinguish between the words Horlick's and Horluck's and the use of the name Horluck's by the defendant in connection with its shops has caused confusion in the minds of the public, and purchasers have patronized defendant's shops believing that such shops were owned and operated by plaintiff,' and also: 'That such confusion as has arisen concerning the proprietorship of defendant's shops has mainly arisen from the similarity between the names of Horlick's and Horluck's used in association with the words "Malted Milk."'

"There being real confusion in the mind of the public as to the identity of the defendant's business, a duty devolved upon the defendant to take affirmative steps to avoid such confusion."

Putting the name "Tillman & Bendel, Inc.," in sober, smaller type, beneath the showy legend "Del Monte" in ornate and conspicuous italic, as was done in this case, does not discharge the "duty" referred to in the foregoing decision. Particularly is this true in view of the appellant's statement, made in another connection, in its brief: "An examination of this group of labels will, we believe, suffice to convince the court that merchandise labeled in this way would be spoken of and identified, and considered in the minds of purchasers, as being 'Del Monte Coffee.' The purchaser might or might not remember that the coffee was produced by Tillman & Bendel, but he would certainly identify the goods by the trade-mark name. These labels show, beyond the possibility of question, that there is no warrant for supposing that any one dealing in the merchandise would consider it to be 'Tillman & Bendel Coffee of the Del Monte grade,' but would on the contrary identify it as 'Del Monte coffee' only."

The appellant seems to have overlooked the fact that the very argument which tends to establish its trade-mark rights in the west —namely, the identifying nature of the phrase Del Monte—will militate against the appellant's invasion of the east, where Tillman & Bendel, Inc., in 1927 was a newcomer, in view of the secondary meaning of the name "Del Monte" theretofore built up by the appellee.

If the public can be excused for confusing "Horluck's" with "Horlick's" a fortiori it will be excused for confusing two brands each bearing the identical name "Del Monte."

In the Del Monte Special Food Case, supra, this court laid considerable stress upon the fact that there "was actual confusion in the minds of purchasers who purchased the appellant's product, in that they believed that the oleomargarine advertised as a 'Del Monte product' was put out by the same people who were producing other 'Del Monte products.'" In the Patent Appeal involving the present litigants, the court, as we have seen, held that there was actual confusion from the use of the "Del Monte" trade-mark.

In A. Y. McDonald & Morrison Mfg. Co. v. H. Mueller Mfg. Co. (C. C. A. 8), 183 F. 972, 974, the court said: "The test is not whether, when goods are placed side by side, a difference can be recognized in the labels or marks; but the test is, when such goods are not placed side by side, would an ordinarily prudent purchaser be liable to purchase the one, believing that he was purchasing the other?"

Similarly, the standard of the "ordinary purchaser" was stressed by the same court in Queen Mfg. Co. v. Isaac Ginsberg & Bros. Inc., 25 F.(2d) 284, 287:

"In order to constitute an infringement, it is not necessary that the trade-mark be literally copied. [Cases cited.] Neither is it necessary that every word be appropriated. There may be infringement where the substantial and distinctive part of the

trade-mark is copied or imitated. [Many cases cited.] Dissimilarity in size, form, and color of the label and place where it is applied are not conclusive against infringement. [Case cited.] The resemblances may so far dominate the differences as to be likely to deceive ordinary purchasers. [Case cited.] Where a trade-mark contains a dominating or distinguishing word such as the word 'Queen' in the instant case, and where the purchasing public has come to know and designate the article by such dominating word, the use of such word by another in marking similar goods may constitute infringement, although the latter mark, aside from such dominating word, may be dissimilar.

"In determining whether an alleged infringing trade-mark is sufficiently similar to be deceptive, and therefore, an infringement, ordinary purchasers, buying under the usual conditions prevailing in the trade, and giving such attention as such purchasers usually give in buying that class of goods, are the standard. Whether an imitation which is not an exact copy constitutes an infringement depends upon whether the resemblance is such as to be likely to deceive purchasers of the standard above defined and cause them to believe in purchasing the goods of the defendant that they are the goods of the plaintiff. In other words, if the resemblance is such as would deceive ordinary purchasers of the goods using ordinary caution, the trade-mark is infringed. [Cases cited.]"

Both the foregoing decisions are quoted with approval by the same court in Reid, Murdoch & Co. v. H. P. Coffee Co., 48 F.(2d) 817, 819, certiorari denied, 284 U. S. 621, 52 S. Ct. 9, 76 L. Ed. 529.

The remaining question to be considered in this phase of the case is whether or not the Del Monte coffee, with which the appellant invaded the eastern field in 1927, possessed "the same descriptive properties" as the appellee's canned fruits and vegetables, for which a secondary meaning in the east is claimed.

As the appellant points out: "It is a fundamental principle of the law of trade-marks that one person may have a valid right to use a trade mark upon one class of goods and another have an equally valid right to use the same mark on another class of goods." Section 5 of the Trade Mark Act of 1905 (15 USCA § 85) contains the following proviso: "Provided, That trade-marks which are identical with a registered or known trade-mark owned and in use by an-

other and appropriated to merchandise of the same descriptive properties, or which so nearly resemble a registered or known trade-mark owned and in use by another and appropriated to merchandise of the same descriptive properties as to be likely to cause confusion or mistake in the mind of the public or to deceive purchasers shall not be registered."

As observed by the Supreme Court in American Steel Foundries v. Robertson et al., 269 U. S. 372, 380, 46 S. Ct. 160, 162, 70 L. Ed. 317: "The mere fact that one person has adopted and used a trade-mark on his goods does not prevent the adoption and use of the same trade-mark by others on articles of a different description. There is no property in a trade-mark apart from the business or trade in connection with which it is employed. [Cases cited.]"

In at least two decisions, the Court of Customs and Patent Appeals has held that coffee belongs to the same class and has the same "descriptive properties" as the kinds of foods put out by the appellee prior to 1928, when the appellee also entered the coffee field. We refer to the Patent Office suit between the present litigants, and to Check-Neal Coffee Co. v. Hal Dick Mfg. Co. (Cust. & Pat. App.) 40 F.(2d) 106. The United States Patent Office places coffee into Class 46, "Foods and Ingredients of Foods."

The appellant, however, in its brief argues that "coffee is not a food at all." It is somewhat surprising to find that counsel cite volume 5, p. 974, of Encyclopaedia Britannica as authority for this view, when reference to that work discloses that at the very page cited, the following statement appears: "Coffee belongs to the medicinal or auxiliary class of food substances, being solely valuable for its stimulant effect upon the nervous or vascular system."

Again, the very first words of the same Britannica article on the berry are as follows: "Coffee. This important and valuable article of food is the produce chiefly of *Coffea arabica*," etc.

In its effort to disqualify coffee as a food, the appellant goes so far as to assert that, "Coffee is no more a food than chewing tobacco." The short answer to this, of course, is that coffee is intended to be swallowed, and tobacco juice is not!

We have no hesitation in concluding that coffee is a food, has the same descriptive qualities as canned fruits and vegetables, and is consequently capable of being the subject of a secondary meaning in connection with a

trade-mark used by the producer of such canned goods, to an extent sufficient to warrant injunctive relief.

The court below held that there was no "evidence of actual damage to defendant arising out of plaintiff's sales of coffee bearing the name 'Del Monte' warranting an award of damages," and the amended decree sets forth that "defendant and cross-complainant take nothing in the way of damages against plaintiff and cross-defendant."

Since the appellee has filed no cross-appeal, the amended decree of the lower court will not be disturbed.

Each party will bear its own costs, here and in the court below.

To summarize, we hold that the amended decree of the District Court should be affirmed in part, and reversed in part, as follows:

1. In so far as it perpetually enjoins the appellant from directly or indirectly using the name "Del Monte" on coffee, not made by or for the appellee, whether prepared for sale, offered for sale, or sold by the appellant in the states of California, Oregon, Washington, Montana, Nevada, and Arizona, it is reversed.

2. In so far as the amended decree enjoins the appellant from using the name "Del Monte" as stated above, elsewhere in the United States than in the six states hereinbefore named, it is affirmed.

3. In so far as it awards to the appellee costs from the appellant, the amended decree is reversed, each party being herein decreed to pay its own costs, in this court and in the court below.

4. In so far as the amended decree holds that the appellant shall take nothing against the appellee, it is reversed, to the following extent, namely: That the appellee, the California Packing Corporation, is hereby forever and perpetually enjoined and restrained from directly or indirectly using the name "Del Monte" on coffee not by or for the appellant made, whether prepared, offered for sale, or sold by the appellee; such injunction and restraint to be in force and effect only in the states of California, Oregon, Washington, Montana, Nevada, and Arizona, and not elsewhere.

5. In so far as the amended decree awards damages to neither party, it is affirmed.

Before a final judgment is entered by this court, we desire to hear from counsel as to the precise terms of the injunction, especially with reference to the form of label to be used by the appellant for its Del Monte coffee, which, under this decision, it will be permitted to market in the above-named western states.

Affirmed in part, reversed in part.

### Supplemental Opinion.

Since examining counsel's briefs relative to the form of label to be used by the respective parties hereto, we have arrived at the conclusion that the terms of the injunction heretofore set forth by this court in the above-entitled cause should remain unchanged, and that decree should be entered accordingly.

Either party shall have the right to apply to the District Court for any further relief to which it may be entitled, under any changed conditions that may occur in the future.