## FEDERAL TRADE COMMISSION v. MAISEL TRADING POST, Inc.*
### No. 976.

Circuit Court of Appeals, Tenth Circuit.
May 1, 1935.

Eugene W. Burr, of Washington, D. C. (William T. Kelley, Chief Counsel, and Martin A. Morrison, Asst. Chief Counsel, for Federal Trade Commission, both of Washington, D. C., on the brief), for petitioner.

John F. Simms, of Albuquerque, N. M. (Donald M. Bushnell, of Albuquerque, N. M., on the brief), for respondent.

Harris K. Lyle, of Gallup, N. M., for Indian Traders' Ass'n, amicus curiæ.

William C. Lewis, of Oklahoma City, Okl. (Harry W. Blair, Asst. Atty. Gen., and Charles E. Collett, of Washington, D. C., on the brief), as amici curiæ.

*Judgment modified and affirmed on rehearing ——F.(2d) ——.

Before LEWIS and McDERMOTT, Circuit Judges, and KENNEDY, District Judge.

KENNEDY, District Judge.

This proceeding was instituted by the Federal Trade Commission under the Federal Trade Commission Act, as set out in 15 USCA § 45. The proceeding was originally commenced by a complaint filed in May, 1932, in which the Commission charged in substance that the respondent while engaged in interstate commerce, by the use of misleading and deceptive terms in connection with the sale of certain types of Indian jewelry, indulged in unfair methods of competition which were prejudicial and injurious to the public, involving practices which tended to divert trade from and otherwise prejudice and injure respondent's competitors. The respondent joined issue by answer and a hearing was had before a trial examiner of the Commission resulting in findings adverse to the respondent and an order directing the respondent to desist from its unfair practices and directing it in connection with its advertisements, catalogues, labels, stamps, etc., to add certain descriptive terms with reference to the jewelry advertised and handled for sale by the respondent. The respondent refused to comply with the terms of the order, and, in accordance with the statute above cited, the Commission before this court seeks a decree enforcing its order upon the respondent.

■ In approaching a discussion of the matter at hand, we observe that the respondent at the outset has a very substantial burden to carry. This grows out of the very nature of the act itself, indicated in two particulars: (1) The Commission itself institutes the proceeding, and, as the complainant, becomes the prosecutor of the charges contained in the complaint before itself as the judicial determining body; and (2) the act provides that "the findings of the Commission as to facts, if supported by testimony, shall be conclusive." However, we take the act as we find it and as it has been construed by the highest court in attempting to solve the problems presented by the record.

■ There are three elements to be considered in determining the validity of the Commission's order. In Federal Trade Commission v. Royal Milling Co., 288 U. S. 212, at page 216, 53 S. Ct. 335, 336, 77 L. Ed. 706, the rule is laid down definitely in the following language: "To sustain the orders of the commission, three requisites must exist:

(1) That the methods used are unfair; (2) that they are methods of competition in interstate commerce; and (3) that a proceeding by the commission to prevent the use of the methods appears to be in the interest of the public."

The second element above mentioned, involving interstate commerce, appears to be eliminated in the case at bar for the reason that the respondent admits that its trade is carried on in interstate commerce. The other two elements remain for consideration, to wit: Whether the methods used are unfair, and, if so, whether the public has an interest in those methods.

The first question revolves around the point of determining whether the terms "Indian" and "Indian-made" in connection with jewelry advertised and sold by the respondent implies a distinct meaning, and if this is determined in the affirmative, then as to whether the general public is deceived or misled in the use of these terms. The terms "Indian" and "Indian-made" are words in common use, and their significance in a restricted sense with the setting here furnished must result, if at all, from a secondary meaning which has become attached to them.

■ The principle of attaching a secondary meaning to a common word or phrase is well established by the courts. Elgin Nat. Watch Co. v. Illinois Watch Case Co., 179 U. S. 665, 21 S. Ct. 270, 45 L. Ed. 365; Herring-Hall-Marvin Safe Co. v. Hall's Safe Co., 208 U. S. 554, 28 S. Ct. 350, 52 L. Ed. 616; L. E. Waterman Co. v. Modern Pen Co., 235 U. S. 88, 35 S. Ct. 91, 59 L. Ed. 142; R. H. Macy & Co. v. Colorado Clothing Mfg. Co., 68 F.(2d) 690 (C. C. A. 10). No doubt this doctrine in connection with trademarks and trade-names has been somewhat extended under the administration of the Federal Trade Commission Act (15 USCA § 41 et seq.).

■ In examining the record upon this first point there appears to be substantial evidence to sustain the theory of the Commission, that the terms "Indian" and "Indian-made" carry the significance in the public mind, when used in connection with jewelry, that such jewelry has been made by Indians by hand exclusively, or with the aid of primitive tools, as distinguished from its manufacture with the use of modern machinery which lessens the time of labor of the Indian in accomplishing his ultimate aim in turning out jewelry products. In scanning the record, it becomes apparent

that the evidence, when considered broadly, is made up of the testimony of anthropologists and Indian traders, the latter of whom are associated together in a voluntary organization for their own protection with their pecuniary interests strongly manifested against the trade practices of the respondent. The scope of the testimony as to its source is therefore somewhat restricted, but otherwise there seems to be no impeachment of it. The use of the terms or either of them in connection with jewelry advertised for sale would constitute an unfair method of competition, if such jewelry were not manufactured in consonance with the generally understood meaning of the terms. With the rule in mind that the evidence of the Commission as to facts, if supported by testimony, shall be conclusive, its findings upon this point manifestly cannot be disturbed.

Upon the second point, as to whether or not the public generally has an interest in the purchase of Indian jewelry as to its method of manufacture, there is some conflict in the testimony. Witnesses for the Commission offered extended testimony toward proof of the theory that the constantly increasing tourist traffic is of a friendly and kindly disposition toward the Indian tribes of the Southwestern portion of the United States as well as having an interest in the traditions of their early and continuous practice in the art of making jewelry from silver. They further testified that this interest is based largely upon the desire to purchase jewelry made by the Indians with the same methods as used by their forefathers, and when it becomes known by the prospective purchaser that it is not manufactured with the use of primitive tools and methods, the purchaser loses interest and refuses to purchase.

On the other hand, the respondent has submitted evidence tending to show that the great rank and file of prospective purchasers of Indian jewelry are chiefly concerned in ascertaining the fact as to whether or not the article has been made by Indians, independent of what kind of tools or machinery may have been employed in the process of manufacture. In the mental processes of the ordinary individual, the use of machinery by the Indian to shorten his labor as being an element which enters into the salability of the article which he produces is somewhat hazy, and suggests an approach to the psychic. It would logically seem that the great body of purchasers would be concerned with the genuineness of the materials of which the article is manufactured, coupled with the fact that it is actually made by those belonging to the Indian tribes. Again, we are confronted with the somewhat anomalous situation of the government establishing Indian schools so that its ward may perfect himself in the arts and sciences to more efficiently compete with his white brother through the use of modern methods and machinery; while the practical operation of the Commission's order would seem to penalize the Indian silversmith in a sense, by compelling him to stick to the primitive, laborious, and time-consuming methods of his ancestors. Yet under the broad scope of the act making the findings of fact of the Commission conclusive, coupled with the extensive and substantial testimony that the general public, interested in the purchase of Indian-made articles, recognizes a difference in the desirability between those articles manufactured by primitive methods and those manufactured with the aid of modern machinery, it would be difficult, if not impossible, for a reviewing court to say that those findings are not sustained.

It remains to consider the order of the Commission in the attempt to eliminate the unfair practices and methods in competition. This order in its entirety reads as follows:

"This proceeding having been considered by the Federal Trade Commission upon the pleadings, the evidence received, and the oral and written argument, and the Commission having made its findings as to the facts and the conclusion that respondent, Maisel Trading Post, Inc., has violated the provisions of an act of Congress, approved September 26, 1914, entitled 'An Act to create a Federal Trade Commission, to define its powers and duties, and for other purposes.'

"It is now ordered that respondent, its agents, representatives, and employees, shall cease and desist from designating, describing, or offering any of its silver jewelry products, made partly by machinery, for sale in interstate commerce by label, stamp, catalogue, advertisement, or otherwise, as 'Indian' or 'Indian-made,' either with or without the addition of the word 'jewelry' or the addition of a word or words for the class of article, as 'bracelet,' 'ring,' 'concha belt,' or the like, unless the label, stamp, catalogue, or advertising shall clearly and expressly state, in immediate context with the said descriptive terms in conspicuous lettering at least three-quarters as high and

three-quarters as wide as the lettering of said descriptive terms, either that the jewelry so designated, described, or offered—

"(a) Has been rolled by machine, or

"(b) Has been pressed by machine, or

"(c) Has been partly ornamented by machine, or

"(d) That there has been used in its production a combination of rolling, pressing, and/or partial ornamentation by machine, as may have been respectively the method of the manufacture of respondent's various products as designated, described, or offered for sale: Provided, however, That the use of hand tools or non-mechanical equipment of whatsoever kind in production, and further that the use of buffing wheels for the polishing of fully fashioned pieces of jewelry, shall not preclude the use by respondent of the terms 'Indian' or 'Indian-made' for any hand-made product, without the making of any explanatory statement.

"It is further ordered that respondent shall, within sixty (60) days after the service upon it of a copy of this order, file with the Commission a report in writing, setting forth in detail the manner and form in which it has complied with and conformed to the order to cease and desist hereinabove set forth."

The record discloses that the Indian is not a producer of silver from its deposits in the earth, nor has he ever indulged in any refining process. In his original operations as a silversmith, the elementary basis of the manufactured article was the silver Mexican peso, which, after being softened by a heat process with the use of a primitive charcoal fire, was pounded into the required shape by the use of a hammer, likewise the product of the white man. Male and female dies or matrices of various types of the Indian's own manufacture were used in making the desired impressions. The article was usually manufactured in the Indian's own hogan or home. The product was of an extraordinary solid, heavy type, which was used almost exclusively by the Indians themselves for personal adornment. As the public began to take more interest in Indian jewelry, it was found that there was no great demand for this heavy type of jewelry, and in seeking to attract the commercial trade the process of making a much lighter article was developed. The plan of using the Mexican peso as the basic element was largely eliminated through the difficulty in securing this coin and its otherwise unde-

sirability, and a plan was adopted of using refined silver in so-called "slugs" which were secured through various and sundry commercial white dealers. The slugs consisted of refined silver rolled by machinery at a factory to a thickness of one-eighth to one-quarter of an inch and then cut into one to two inch squares, which were likewise pounded into the desired shape. With the passing of the primitive charcoal method of heating came the modern blowtorch which was much more effective and rapid in the annealing process, and the silver slug when annealed was then pounded into the thickness and shape desired. The primitive tools used by the Indian for adorning the article were again discarded in favor of the dies and matrices of any required design manufactured by the white man. The Indian bracelet and ring is usually adorned with the predominating choice Indian stone of the Southwest, the turquois. The Indian has never mined this precious stone, and except in rare instances has he ever prepared and polished it for use in connection with a bracelet or ring. The stone is purchased in quantities from dealers ready for attachment to the bracelet or ring. After the article was made into the desired shape the ornaments were attached, such filings were made as seemed necessary, and the finished article, after being oxidized, was first polished by hand, which operation was later superseded by the use of the more modern instrument of white-man manufacture, the buffing wheel. Such was the method in vogue for the manufacture of Indian jewelry up to the time when the machines of which the petitioner complains were brought into the picture. The respondent installed modern machinery for rolling silver to the desired thickness and cutting the sheets so rolled or those which were purchased from dealers, by stamping into desired forms. Dies of various kinds and types were likewise operated by machinery. The remaining process was the same as before. Respondent employed a substantial number of Indians in connection with the manufacturing plant in the rear of his retail establishment at Albuquerque. No attempt was made upon the part of the respondent to conceal the method by which the manufacture of the articles was taking place. Visitors and customers were permitted to go and were even conducted through the manufacturing plant. The only functions of the proprietor and his white employees with the system of manufacture were in keeping the Indians' time and in giving them orders for

an article in connection with a demand for the same, but allowing him to use his own fancy and ingenuity of design. By the use of machinery in rolling and stamping or pressing, the saving of time in the manufacture of one bracelet over the method of pounding the silver into the desired shape, is approximately one hour and thirty-five minutes.

The complaint of the Commission, as demonstrated by its findings and order, is substantially confined to the elimination, except with notice to the public, of the pounding process for which the rolling and pressing machines have been substituted, together with the operation of the dies or matrices by machine. As a corollary to this proposition it must follow that the adjudged deceit of the public is on account of the Indian not having spent the one hour and thirty-five minutes additional time in pounding the basic silver into the desired shape and thickness. It seems to be the theory of several of the witnesses testifying in behalf of the Commission, principally the anthropologists, that through the pounding process the Indian has put something of himself into the article which he manufactures. The testimony of no Indian supports this theory and it is a fair conjecture that, so far as the Indian is concerned, the shortest route to the desired remuneration is his chief objective. Nevertheless, the theory of the anthropologists must be sustained, if supported by substantial evidence.

It will be noted that the findings and order of the Commission attempt to straighten out the situation by requiring the display of Indian jewelry for sale by label, stamp, catalogue, advertisement, or otherwise, to specify that a machine has been used in rolling, pressing, or ornamenting the Indian-made article, but it is silent as to the use of rolled silver in the initial slugs and the modern blowtorch in the annealing process, and specifically permits the use of hand tools, however manufactured, as well as the buffing wheel. There appears to be nothing in the order which requires the representation that the manufacturing operation must be performed exclusively by Indians.

We believe that the Commission has been arbitrary in selecting for partial consideration the methods of machine use entering into the manufacture of Indian-made jewelry, in that it specifically eliminates certain machines without notice given of their use, and exempts other equally modern machines in regard to which no notice is required.

This is not in a true sense a safeguard to the purchasing public. If the public is entitled to be advised along the line of distinguishing articles made through primitive methods and those manufactured through more modern methods, the field should be covered thoroughly. While we believe in a technical sense that the evidence is sufficient to support and sustain the order of the Commission in its general purpose and intent, yet surely it should be modified in such a way as to show, through label, stamp, catalogue, or advertisement, that the process of manufacture is performed by Indians and to specify the steps in which there is a use of modern machinery as distinguished from the primitive methods. This may be accomplished by extending the specifications which must be included in the catalogue, label, stamp, or advertisement, or such other device as may be used. By the order of the Commission, obviously a standard for the commercial handling of jewelry made by Indians of the Southwestern United States is set up. It must in the nature of things be a rule which binds not only the respondent, but other Indian traders and dealers, as well as the Indian himself, if he deals with the public. The plan to be proposed will operate with fairness and equality upon the Indian, the respondent, other traders, and the public, so that it may be known exactly what type of article, as to the process of manufacture, is being offered for sale. In this way those who desire to purchase Indian jewelry manufactured by primitive methods can be fully advised by the advertised inducement that perhaps the Indian silversmith has become modernized in his methods and may avoid his handiwork if it does not appeal to their æsthetic tastes.

The order of the Commission should accordingly be modified.

Beginning with the second paragraph of the Commission's order, it will be modified so as to read as follows:

"It is now ordered that respondents, its agents, representatives, and employees, shall cease and desist from designating, describing, or offering any of its silver jewelry products, made partly by machinery, for sale in interstate commerce by label, stamp, catalogue, advertisement, or otherwise, as 'Indian' or 'Indian-made,' either with or without the addition of the word 'jewelry' or the addition of a word or words for the class of article, as 'bracelet,' 'ring,' 'concha belt,' or the like, unless the label, stamp, catalogue or advertising shall clearly and expressly

state, in immediate context with the said descriptive terms in conspicuous lettering at least three-quarters as high and three-quarters as wide as the lettering of said descriptive terms, that the jewelry so designated, described or offered—

"(a) Has been made by Indians.

"(b) Has been manufactured from silver slugs made from machine-rolled silver.

"(c) Has been manufactured from machine-rolled sheet silver.

"(d) Has been ornamented with turquois (or other stones) not made by Indians.

"(e) In the manufacture, a rolling machine has been used.

"(f) In the manufacture, a pressing machine has been used.

"(g) In the manufacture, dies or matrices made by white men have been used.

"(h) In the manufacture, dies or matrices made by white men and propelled by machines have been used.

"(i) In the manufacture, a buffing wheel for polishing has been used.

"That only so many of the specifications above enumerated shall be set forth as to correctly state the process of manufacture of the article."

A decree will issue in due course affirming the order of the Commission as so modified; each party to pay its own costs.