SAYLES BILTMORE BLEACHERIES INC. *et al. vs.*
NARRAGANSETT WIPING SUPPLY COMPANY *d.b.a.*
"LORRAINE MILL OUTLET" *et al.*

JULY 16, 1957.

PRESENT: Flynn, C. J., Condon, Roberts and Paolino, JJ.

100 

CONDON, J. This is a bill in equity to enjoin the respondents from using the name "Lorraine" or "Lorraine Mill Outlet" in their retail store located in a mill building formerly owned by Lorraine Manufacturing Company. After a hearing in the superior court on bill, answer, replication, and proof, the trial justice found that the complainants had an exclusive right to the name "Lorraine" as a registered trade-mark and as a trade name, and further that the respondents' use of it in their business tended "to mislead and confuse the public to the injury of the complainants" and hence they were guilty of unfair competition from which they should be enjoined. A decree granting the injunction prayed for was thereupon duly entered. The case is here on the respondents' appeal therefrom.

The respondents contend that the decree is against the law in that neither complainant had the right to sue and

in any event there is a misjoinder of complainants; also that the decree is against the evidence in that there was no proof of infringement of the registered trade-mark, nor of deceit, fraud, and confusion of the public which are the bases of the allegation of unfair competition. The respondents also contend that they were prejudiced by numerous erroneous rulings on the admission of evidence. On the view which we take of the law applicable to the undisputed facts of the case we shall not have occasion to consider all of these points; hence there is no necessity for describing them at any further length.

However, a statement of the undisputed facts at this point may contribute to a better understanding of the ultimate conclusions to which we have come concerning the applicable law. In December 1954 respondents opened a store in a mill building on Mineral Spring avenue in the city of Pawtucket under the name of Lorraine Mill Outlet for the sale of candy, drugs, sundries, remnants, ready-to-wear clothes, shoes, and work clothes. Ready-to-wear garments represented 70 per cent of their trade. They did not sell or represent that any textile goods which they offered for sale were Lorraine goods.

In advertising their business both on signs and in the newspapers they always used the name Lorraine Mill Outlet and never represented directly or indirectly that they were the successors of Lorraine Manufacturing Company. Their store is located in one of the mill buildings which was formerly owned and operated by that company in the manufacture of a variety of textile fabrics from 1881 until 1953 when it went out of that business and sold all of its mill buildings and machinery. The respondents' business is conducted strictly as a retail cash-and-carry store, so called, appealing to customers within a limited local area. The words Lorraine Mill in its name furnish an apt way of identifying the location of the store.

The Lorraine Manufacturing Company was incorporated

in 1896 as a Rhode Island corporation and was engaged in manufacturing cotton, silk, woolen and rayon fabrics on Mineral Spring avenue in Pawtucket until October 1953. At that time it processed its last piece of goods. Thereafter on December 15, 1953 it changed its name to Sayles Biltmore Bleacheries, Inc. and is now engaged in bleaching, dyeing, and otherwise finishing cloth and textile fabrics. This change of corporate name was officially recorded in the office of the secretary of state on December 30, 1953 at 10:15 a.m.

However, on December 15 before effecting such change and for the purpose of preserving the name Lorraine Manufacturing Company the directors authorized its president and treasurer or secretary to consent in writing to the use of that name by the Sayles Land Company which is controlled by the same interests that control Sayles Biltmore Bleacheries, Inc. Thereupon Sayles Land Company changed its name to Lorraine Manufacturing Company and such change was recorded in the office of the secretary of state on December 30, 1953 at 10:20 a.m. This company is the other complainant in the instant suit.

Later in 1954 Sayles Biltmore Bleacheries, Inc. sold all its mill buildings on Mineral Spring avenue including the one now occupied by respondents. In 1955 it completed the sale of all its machinery and had previously notified the trade that it would present no new lines since it was not manufacturing any more. Prior thereto its trade had consisted of various jobbers and "cutting-up" mills with whom it did a wholesale business. Until 1941 it conducted a retail store in one of its mills where it sold remnants, some of which were "seconds."

Since selling its mills and machinery the company has not manufactured any textile fabrics and has no present intention of doing so. Its sole business, which it now carries on in North Carolina, is dyeing, bleaching, and finishing cloth. It does not use the name of Lorraine Manufacturing

Company there. Except for an office which it maintains at Sayles Finishing Plants, Inc. in Saylesville, Rhode Island, it has no business in this state.

Apparently the interests which control Sayles Biltmore Bleacheries, Inc. and the former Sayles Land Company assumed that by transferring to that company the right to adopt the name of Lorraine Manufacturing Company they had preserved for use in the future the name Lorraine both as a trade name and a registered trade-mark. In this we think they were mistaken.

The president of the new Lorraine Manufacturing Company testified that although no corporate action had been taken, it was the intention of such controlling interests to have the company allow the American Bleached Goods Company to use the name "Lorraine" on its products. That company is owned by the Sayles Finishing Plants, Inc. It is located in New York where it is engaged in the converting business. It does not manufacture cloth nor does it dye, bleach or finish. As a converter it buys goods in the grey from various mills, has them finished at finishing plants, and then sells the finished goods. Presumably it is on such goods that the Lorraine trade-mark is to be used.

The same witness testified further that in his opinion it would make no difference whether a formal vote granting such permission had been taken, since precisely the same interests which controlled Lorraine Manufacturing Company also owned Sayles Finishing Plants, Inc. In other words, it appears that those interests felt that they could at will pass around the exclusive use of the name Lorraine to corporations which they controlled regardless of the nature of the business of such corporations or the kind and character of their products. Pursuant to this belief the new Lorraine Manufacturing Company joined in the instant bill of complaint and based its right to do so solely on its adoption of that corporate name with the consent of the former

Lorraine Manufacturing Company before it became Sayles Biltmore Bleacheries, Inc.

This new company has never engaged in any kind of business. Under its former name of Sayles Land Company it dealt exclusively in real estate conformably to the purposes set out in its articles of association. It has never used the name Lorraine in either manufacturing or merchandising. For a period of four or five years before the trial in the superior court it had been inactive. It has never used the words Lorraine Mill or Lorraine Mill Outlet in any way and neither has Sayles Biltmore Bleacheries, Inc.

In the circumstances we are of the opinion that this new Lorraine Manufacturing Company has no legal standing as a complainant in this suit. It has acquired no exclusive right to the word Lorraine as a trade-mark, because it has never manufactured or sold any goods to which it has been affixed. And it cannot claim exclusive use of the word as a trade name since it has never engaged in trade under such name.

A trade-mark does not exist apart from the particular article or goods. *Mishawaka Rubber & Woolen Mfg. Co.* v. *S. S. Kresge Co.,* 119 F. 2d 316. Before there can be any wrong done to one who claims an exclusive right to a mark or name there must have been a use by him of the mark on his goods or of the name in actual conduct of the same or a substantially similar business. This is necessarily so because the essence of the wrong done by the second user consists in the sale of his goods as those of the first user. Manifestly there must be a first use before there can be an unlawful second use. *Elgin National Watch Co.* v. *Illinois Watch Case Co.,* 179 U. S. 665.

At this point, assuming without deciding that Sayles Biltmore Bleacheries, Inc. had a lawful right to the exclusive use of the word Lorraine as a trade-mark and a trade name, it nevertheless could not assign such right apart from the goods or business connected with that mark or name. The

principle has been clearly stated as follows in *United Drug Co.* v. *Theodore Rectanus Co.,* 248 U. S. 90, 97: "There is no such thing as property in a trade-mark except as a right appurtenant to an established business or trade in connection with which the mark is employed. The law of trade-marks is but a part of the broader law of unfair competition; the right to a particular mark grows out of its use, not its mere adoption; its function is simply to designate the goods as the product of a particular trader and to protect his good will against the sale of another's product as his; and it is not the subject of property except in connection with an existing business."

It is true that a trade-mark or name may be assigned, but only if it remains associated with the product or business with which it first became associated in the public mind. *Cardinal* v. *Taylor,* 302 Mass. 220. And that court has elsewhere plainly stated: "A trade mark or trade name, indicating that goods are manufactured or sold by a certain business organization * * * can have no existence in gross, unconnected with some business in which it is used." *Jackman* v. *Calvert-Distillers' Corp. of Mass.,* 306 Mass. 423, 426. It appears to be universally held that an assignment unaccompanied by such characteristics is void. *La Fayette Brewery, Inc.* v. *Rock Island Brewing Co.,* 87 F. 2d 489; *Molka Wines Co.* v. *Rosenthal,* 160 Misc. 805. aff'd 248 App. Div. 863; *Rodseth* v. *Northwestern Marble Works,* 129 Minn. 472.

In the case at bar Sayles Biltmore Bleacheries, Inc. sought to transfer or assign its Lorraine trade-mark by consenting to the adoption of its former corporate name by Sayles Land Company. But it did not transfer any part of its business of manufacturing textile fabrics which it had carried on under that name. Nor did the new Lorraine Manufacturing Company manufacture or intend to manufacture those textile products with which the name Lorraine had become associated in the textile trade. On the contrary,

it appears that the only reason such name was made available to this inactive land company was to preserve it for use in the future by the American Bleached Goods Company, which is engaged in a business markedly different from the manufacture of textile fabrics.

In the face of those facts it is not possible to find that the new Lorraine Manufacturing Company has acquired any lawful right to the exclusive use of the word Lorraine as a trade-mark or trade name. In this connection the following language in *Rodseth* v. *Northwestern Marble Works*, 129 Minn. 472, 476, well expresses the law applicable to the instant case: "One having the right to use a trade name cannot convey to another the naked right to the exclusive use of such name independent of any interest in the property or business to which it has been applied. * * * Where the bare right to use the name is all that is transferred, the name no longer serves to point out and protect the business with which it has become identified, nor to secure the public against deception, but tends to give to a different business the benefit of the reputation established by the business to which the name had previously been applied; and the courts are unanimous in holding that such transfers are of no effect."

In our opinion the trial justice erred in not dismissing the bill of complaint as to complainant Lorraine Manufacturing Company notwithstanding that the word Lorraine is a part of its corporate name. That fact without more is not sufficient to entitle it to the relief which it seeks against the respondents. *Yellow Cab Co. of San Diego* v. *Sachs,* 191 Cal. 238; *Good Housekeeping Shop* v. *Smitter,* 254 Mich. 592.

This brings us to the question whether Sayles Biltmore Bleacheries, Inc. is also without legal standing to maintain the bill of complaint as contended by respondents. Merely for the purpose of considering that question we shall assume that said company, under its former corporate name

and by reason of its registered trade-mark Lorraine, had acquired the exclusive right to use that mark and that in the textile trade it had come to signify Lorraine Manufacturing Company as the source of the textile products that bore such trade-mark or name.

According to the undisputed evidence its trade was exclusively wholesale, at least after 1941 when it ceased to sell remnants at retail. And its wholesale customers were jobbers and mills engaged in the "cutting-up trade" so called. By identifying its goods with the Lorraine trade-mark and by extensive advertising in newspapers and magazines as well as by radio, that mark became well established among such customers as the symbol that identified Lorraine Manufacturing Company as the source of those goods. This association of the trade-mark and the company continued unbroken at least down to 1955. But on December 15 of that year it sold its last piece of machinery. It had already notified the trade in October 1953 that it would present no new lines of goods and that it had ceased manufacturing.

Following such notice, in December 1953 it engaged solely in the finishing business. Thereafter it sold all of its mills and machinery in Pawtucket and transferred its activities in pursuit of its new enterprise to North Carolina. Except for a so-called Lorraine division office which it maintained in the Sayles Finishing Plants, Inc. in Saylesville, Rhode Island, for the purpose of liquidating its Rhode Island property, the name Lorraine in the Pawtucket area and among the textile trade generally became but a memory of things that used to be.

The undisputed evidence is that since 1953 Lorraine fabrics have not been manufactured; that there is no present intention on the part of Sayles Biltmore Bleacheries, Inc. to resume manufacturing them; that it no longer has the mills and machinery for doing so; and that it does not now have on its hands for sale any products which it manufac-

tured under its former name. In our opinion it has not only abandoned the name of Lorraine Manufacturing Company but it has also completely abandoned manufacturing and merchandising the special products with which the name Lorraine was so long associated in the textile trade and in the Pawtucket area where respondents are presently conducting their retail business. In our opinion there can be no doubt in the public mind that the old Lorraine Manufacturing Company and its Lorraine fabrics have ceased to be.

In view of that fact we are constrained to hold that complainant Sayles Biltmore Bleacheries, Inc. is also without legal standing to maintain the instant bill of complaint. If there were evidence that it intended within a reasonable time in the future to return to the manufacture of fabrics and that it desired to preserve its trade-mark rights to the use of the name Lorraine for that purpose, we would be inclined to view its claim to relief more favorably. But clearly there is no need of further inquiry on that score since its responsible representative has testified that it has no such intention. Indeed on the contrary he has testified that it is the intention of the interests which control the complainant company to transfer the name Lorraine to another company which does not manufacture cloth but is merely a converter that buys and sells cloth manufactured and finished by others.

Fairness to the consuming public requires that a trade-mark or trade name may not be assigned to one whose business or products have no connection with the business or products of the first user. *Jackman* v. *Calvert-Distillers Corp. of Mass.*, 306 Mass. 423. This principle is generally stated as follows: "A trade-mark or name cannot be assigned except in connection with an assignment of the particular business in which it has been used, with its good will, and for continued use in conjunction with or on the same article or class of articles which it was first applied to, and

used on, by its original adopter." 87 C.J.S., Trade-Marks, Etc., §171 c, p. 501.

When the old Lorraine Manufacturing Company stopped manufacturing, sold all its mills and machinery, notified the trade that no more lines of Lorraine fabrics would appear on the market, gave up its corporate name and expressly consented to its adoption by another company not engaged in the manufacture of cloth, and thereafter actually engaged in a radically different business exclusively in a new location far removed from Pawtucket, it surrendered its rights to exclude others from using without any misrepresentation the name Lorraine which it had thus expressly abandoned.

There is no room for it to complain that the respondents who are now using such name are engaging in unfair competition, because it is no longer operating in the same competitive business or geographical area and therefore could not be injured by respondents' use of the name. If respondents were holding themselves out as the successors of the Lorraine Manufacturing Company, the case would be different. *Armington* v. *Palmer,* 21 R. I. 109. The respondents in that case were holding themselves out as "successors to Armington & Sims Engine Company" and were rightly enjoined from so doing, since that company was still in existence even though it was not actually doing business.

Whether the public would be deceived if respondents in the case at bar represented that the merchandise which they are offering for sale at the old Lorraine Mill was made by Lorraine Manufacturing Company we need not consider at this time since there is no evidence to that effect in the transcript. And there is no evidence that they ever used the registered trade-mark Lorraine. As long as respondents confine their use of the name Lorraine Mill Outlet merely to identifying the location of their store in the old Lorraine Mill, which in our opinion is the most that the evidence shows, and do not represent that they are the suc-

cessors of Lorraine Manufacturing Company, or that the products they are offering for sale were made by that company, they cannot reasonably be deemed guilty of competition which is unfair to Sayles Biltmore Bleacheries, Inc.

For the above reasons the respondents' appeal is sustained, the decree appealed from is reversed, and the cause is remanded to the superior court with direction to enter a new decree denying and dismissing the bill of complaint.

FLYNN, C. J., did not participate in the decision.

*Edwards & Angell, Edward F. Hindle, Stephen A. Fanning, Jr.,* for complainants.

*Isidore Kirshenbaum, Frank H. Bellin,* for respondents.

ROSE CINQUANTO *vs.* AMERICAN SILK SPINNING COMPANY

JULY 16, 1957.

PRESENT: Flynn, C. J., Condon, Roberts, Andrews and Paolino, JJ.

112

PAOLINO, J. This is an employee's original petition praying that the workmen's compensation commission declare valid a purported preliminary agreement; that it order the same transmitted to the office of the director of labor and filed therein with certain words deleted therefrom; and that the commission adjudge the respondent in contempt for failing to file such agreement. After a hearing thereon, the decree of the trial commissioner denying and dismissing the petition for lack of jurisdiction was affirmed by a decree of the full commission. From such decree the petitioner has appealed to this court. Although she has filed four reasons of appeal, she has briefed and argued only her third reason. The others are therefore deemed to be waived.

The record discloses the following pertinent facts. On February 18, 1953 petitioner filed an original petition in the office of the director of labor. After a hearing thereon a decision was rendered by the department of labor on May 8, 1953 finding that petitioner became partially disabled on September 2, 1952 and ordering the payment of compensation for partial incapacity in the sum of $18 per week from September 3, 1952. Thereafter respondent appealed from such decision to the superior court. While the appeal was pending in that court and before any hearing was held thereon, the parties reached an agreement as to the amount of compensation which was due the employee.

Thereupon the respondent insurer prepared four copies of a preliminary agreement and four copies of a compensation suspension agreement and receipt. These were all sent to petitioner's counsel, and on November 20, 1953 they were executed by her in his presence. He then returned all of the copies to the insurer. Thereafter, in accordance with the agreement of the parties, the petitioner received the sum of $716.40 in full payment of compensation claimed to be due for the period from the date of the injury to June 9, 1953, the date on which the petitioner certified she was able to return to work. The compensation suspension agreement contained a typewritten statement that this payment was made in accordance with the decision of the director of labor dated May 8, 1953. A stipulation was filed in the superior court on February 12, 1954 by respondent insurer's counsel stating: "The appeal of the employer respondent from the Decision of the Director of Labor, dated May 8, 1953, is hereby discontinued." Copies of said stipulation were sent to and were received by the department of labor and petitioner's counsel.

Sometime thereafter petitioner, feeling that she was disabled, again consulted her counsel. He communicated with respondent's insurer and requested a copy of the preliminary agreement. He was then told by the insurer that such agreement had been marked "void" and had not been forwarded to the director of labor for approval. However, the insurer had forwarded the compensation suspension agreement and receipt which had been approved by the director of labor on January 26, 1954. In response to petitioner's request the copies of the preliminary agreement were transmitted to her counsel and he thereupon commenced the instant proceeding and attached the original preliminary agreement to the petition.

There is no dispute about the fact that four copies of the preliminary agreement and four copies of the compensation suspension agreement were all signed by petitioner and

witnessed by her counsel. He admitted that he had no understanding with respondent's insurer as to what was to be done with the executed preliminary agreement or that they would forward the agreement to the director of labor.

After the hearing the trial commissioner entered a decree which contained the following findings of fact: "1. That said Commission has no jurisdiction over preliminary agreements which have not been duly approved by the Director of Labor. 2. That original jurisdiction for receipt of and approval of preliminary agreements is vested in the Department of Labor. 3. That the petitioner was paid benefits in compliance with the order of the decision of the Department of Labor dated May 8, 1953, and the compensation suspension agreement and settlement receipt, which was duly approved by the Director of Labor on January 26, 1954." In accordance with such findings the petition was denied and dismissed. Thereafter on May 24, 1956 the findings of fact and orders contained therein were affirmed on appeal by a final decree of the full commission.

Under her third reason of appeal, which is the only one she is pressing, petitioner states: "That the Decree of the Commission heretofore entered on May 24th, 1956 is against the law, the evidence and the weight thereof." Both parties agree that the main issue raised in the instant record is whether or not the workmen's compensation commission has jurisdiction to order respondent to file the purported preliminary agreement with the director of labor. This, however, raises still another question, namely, whether or not the commission has authority to order the director of labor to do what petitioner requests by her petition.

The petitioner's purpose in prosecuting the instant petition is to place herself in a position where she can ultimately file a petition to amend the original preliminary agreement. She therefore contends that the commission has jurisdiction to grant the relief prayed for. In support of this argument she claims that the determination of the question

presented is one of statutory construction and that therefore public laws 1954, chapter 3297, should be construed liberally. She further contends that sec. 3 (a) and sec. 17 of article III, and sec. 5 of art. IX of said chapter are procedural and should govern all cases which come before the commission after chap. 3297 became effective, regardless of the date when such cases were filed. Therefore since the instant petition was filed after the pertinent sections of chap. 3297 became effective, petitioner contends that the workmen's compensation commission, by the very act which created it, has jurisdiction over the parties and power and authority to order the relief prayed for under the express provisions of said secs. 3 (a) and 17 of art. III and sec. 5 of art. IX of chap. 3297. Those sections became effective on July 1, 1954.

Moreover petitioner further contends that secs. 3 (a) and 17 of art. III, and sec. 5 of art. IX should receive the same construction or interpretation as was given by us in *Berditch* v. *James Hill Mfg. Co.*, 85 R. I. 69, 125 A. 2d 204, where we held that secs. 4 and 7 of art. III of chap. 3297 were intended to be largely procedural and to govern all cases which at the time were not decided and would thereafter have to come before the workmen's compensation commission.

The respondent explains the presence of the preliminary agreement in these proceedings by stating that the agreement was prepared and sent to petitioner by a mistake on the part of the insurer's office staff. Moreover respondent contends that under the procedure followed by the parties in the instant case the execution of the preliminary agreement was not required by the act; that it should therefore be considered as unessential surplusage; and that it should be totally disregarded. In addition to this, respondent contends that since the agreement had not been approved by the director of labor it had no legal effect as a contract. Moreover, petitioner does not deny that she received all the

compensation agreed upon at the time she executed the agreements.

The respondent contends that the commission lacks the power to grant the relief prayed for on the ground that under art. III, sec. 1, of the act the director of labor is vested with exclusive jurisdiction over the approval of such agreements. The respondent further contends that there is no provision in the act vesting authority in the commission to order such agreement transmitted to the director of labor as prayed for. Nor is there any provision in the act requiring either the employer or its insurer to file such agreement with the director of labor. Finally respondent contends the act does not authorize the commission to adjudge either party in contempt for failure to file such agreement with the director of labor.

In *Wolf* v. *Price-Fletcher Tree Service,* 83 R. I. 467, 119 A. 2d 723, we recently held that the workmen's compensation act is entirely statutory and that a petitioner's rights thereunder are governed by its provisions. In the instant case the petitioner filed her original petition for compensation in the office of the director of labor under the provisions of general laws 1938, chap. 300, art. III, §2, of the act as it then existed. In such circumstances the preliminary agreement which had been executed by the parties was not required by any provision of the act and should therefore be considered as unessential surplusage and should be totally disregarded. Moreover when respondent's appeal was discontinued in the superior court the status of the petition was again governed by the decision of the director of labor which came into full force and effect at that time. The execution of the compensation suspension agreement and receipt thereafter by the parties was the proper procedure.

FLYNN, C. J., did not participate in the decision.

*Robert T. Flynn,* for petitioner.

*Worrell & Hodge, Eldridge H. Henning, Jr.,* for respondent.